**SMITH et al. v. FERRELL et ux.**

No. 1507—5801.

Commission of Appeals of Texas, Section A.

Jan. 6, 1932.

W. J. Howard, of Houston, for plaintiffs in error.

J. W. Lockett, of Houston, for defendants in error.

CRITZ, J.

On May 7, 1925, Mrs. R. E. Smith and husband, R. E. Smith, filed suit in the district court of Harris county, Tex., against B. W. Ferrell and wife, L. L. Ferrell, to recover title and possession to a certain tract of land situated in Harris county, Tex., fully described in the petition. Ferrell and wife were duly served and answered in the cause.

On October 20, 1927, a judgment was rendered and entered in the above cause in favor of the Smiths, awarding them the land sued for. This judgment provides for writ of possession in favor of the Smiths, decrees that the Ferrells pay costs, and in all respects finally disposes of all the parties and issues involved.

The above judgment shows upon its face that the case came on for hearing in its regular order; that all parties, plaintiffs and defendants, appeared in person, and by their attorneys, and announced ready for trial; that a jury was waived, and all matters of law and of fact submitted to the court. The judgment then recites that the court was advised that an agreement had been entered into between the plaintiffs and defendants. The judgment then recites the terms of the agreement, and decrees accordingly. We think this is a sufficient statement of the judgment to meet the purposes of this opinion.

Later on, March 20, 1928, about five months after the rendition of the above judgment, Ferrell and wife instituted this proceeding by filing a petition—in form and effect, a bill of review—to set aside the above judgment, and recover certain land described in the bill. We presume the land put in issue in the bill is substantially the same as the land involved in the above judgment.

This case is governed by the Practice Act, which applies, among others, to the district courts of Harris county. This act, among other things, provides: "Judgments of such civil district courts shall become as final after the expiration of 30 days after the date of judgment or after a motion for a new trial is overruled as if the term of court had expired. After the expiration of thirty days from the date the judgment is rendered or motion for new trial is overruled, the judgment cannot be set aside except by bill of review for sufficient cause, filed within the time allowed by law for the filing of bills of review in other district courts." Article 2092, subd. 30, R. C. S.

From the statement we have made, it is evident that this proceeding must be considered as a bill of review in the district court filed after the term had expired, since it was filed more than thirty days after the judgment sought to be set aside was rendered, and no motion for a new trial was filed within ten days, as required by subdivision 29 of article 2092, supra.

Where the action is to set aside a judgment rendered at a term of court which has expired when the bill is filed, it is necessary that the petition or bill plead facts sufficient to establish two things: (a) That the petitioner had a good defense to the action in the first instance; and (b) that he was prevented from making such defense by fraud, accident, or the wrongful act of the opposing party, unmixed with any fault or negligence of his own. The facts adduced on the trial of the bill must be sufficient in law to substantiate the allegations thereof. Goss v. McClaren, 17 Tex. 107, 67 Am. Dec. 646; Johnson v. Templeton, 60 Tex. 238; Merrill v. Roberts, 78 Tex. 28, 14 S. W. 254; Green v. Green (Tex. Com. App.) 288 S. W. 406.

The petition in the instant case is sufficient in law to allege a meritorious defense to the original cause of action asserted by the Smiths against the Ferrells. Also the evidence is sufficient in law to support the allegations of the petition in this respect. In fact, no issue is made by the plaintiffs in error in this court as to that matter.

By proper assignment of error, the Smiths contend that the Court of Civil Appeals erred in refusing to make a finding of fact on the issue of diligence or want of diligence on the part of the Ferrells in failing to present their defenses in the first instance. We have examined the opinion of the Court of Civil Appeals, and we construe such opinion to find as a matter of fact, and also as a matter of law, that sufficient diligence on the part

of the Ferrells was shown. We therefore overrule this assignment.

■■ At this point we call attention to the fact that, where a case is presented in the Supreme Court on writ of error, this court is bound by the findings of fact made by the Court of Civil Appeals, unless we are able to say, as a matter of law, that there are no facts which will support the finding of that court. Of course, the Court of Civil Appeals, in making a finding of fact, has no power to substitute its finding for the finding of the trial court or jury. The Court of Civil Appeals has not attempted to do that in this instance.

■■ By proper assignments the Smiths contend that there is no evidence in this record sufficient in law to show that the Ferrells were prevented from making their defense in the first instance by fraud, accident, or the acts of the Smiths, unmixed with any fault or negligence on their part. In order to determine this question, we must carefully examine the testimony of B. W. Ferrell, who is the only witness who testified to any material facts in regard to this issue. We here reproduce so much of his testimony as bears on this issue:

"Now, in reference to that suit that Mrs. Smith and her husband brought against me and my wife some three or four years ago. That case was never tried in court. It was set for trial and I appeared when it was set but it was not tried at that time. So far as I know there wasn't any evidence introduced in the case, and there was never any trial of the case so far as I know. I come down here for the trial, and when I got here my attorney that I had at that time didn't have nary a witness summoned, and I asked him why was it that he didn't have my witnesses and his excuse was that Mr. Gillespie said I didn't have no show, that there wasn't no use summoning them, and that was his excuse. I did not remain here to see whether it would be tried, or not, but we proposed a compromise; we went over to his office in the First National Bank Building and I proposed to pay the costs of court if Mrs. Smith would give me my road that I had graded on out to the county road, and give her that little strip where my house sets now, but not none of the improvements. She would give me my improvements and let me set them back and give me a road, but that proposition was not accepted. That was a discussion between me and my attorney, but Mrs. Smith was not present. I never made any proposition direct to Mrs. Smith at that time, and she didn't make any proposition.

"I don't think my case was called for trial that day when it was set; it was not called while I was in court. A jury had been demanded in the case and I never heard anybody waive a jury. I was not present in court when any judgment was rendered in the case, and if a judgment was rendered I did not know when it was rendered. The first I heard of a judgment being rendered must have been something like twenty days after that, when I had a talk with my attorney. I had not known up to that time anything about a judgment in the case. My wife was not present when the judgment was rendered, if one was rendered; she wasn't here at court, she was home, because she wasn't able at that time to come to court. I did not admit that the land I was claiming at that time was in the Amos Barber survey; it was not in the Amos Barber survey, and I have never admitted that in my life to anybody. If I had admitted that I would not be claiming it. * * *

"I never admitted, nor authorized anyone else to admit for me that the east line of Washington County Section, or the west line of the Barber survey is 54.85 feet south 58 west from the wagon thimble. I never agreed, nor authorized anyone else to agree, that the strip of land Mrs. Smith was claiming when she sued me was in the Barber survey.

"In October, 1927, when the case of Mrs. Smith against me was set for trial, I think I was around the court house until about noon, maybe a little after noon. Then I went over to the office and never came back to court any further after that, but went home. I did not come back the next day for the trial. I didn't come back because I put that proposal up to Walton, my attorney at that time, and if she would do that I would compromise and pay the costs of court, but I didn't propose to pay her attorney's fees. My attorney did not report to me any agreement like that that day, but he said he would go over and have a talk with them. I never saw him any more that day, and never saw him any more for about twenty days afterwards. I don't remember why I didn't come back the next day to try the case, but I didn't see there was any use, he didn't have any witnesses summoned, and I had proposed a compromise. My attorney did not tell me to come back. I didn't think there was any use to come back. I didn't think there was any use to come back because I thought that we had come to a compromise and I would be notified of it, and Walton never told me to come back. I had never had a case in court in my life and I was ignorant, I will acknowledge that, and I was depending on him, and I paid him for his work. Mr. Walton told me he would go and talk to the other side and see if some other compromise would be acceptable to them. I don't remember if he said he had had a conversation with them about a compromise, or not. He and my son from Goose Creek left his office at the same time me and Mr. Finley did, and they went to Judge Amerman's office and me and Finley went home. He was in a hurry to get home and I went home with him.

He said something or another that day about the suit would come up and I asked him why he hadn't summoned the witnesses, and I told him I didn't see any use of going into court without a witness, and I proposed a compromise. When he left the office to go and talk about the compromise he never said anything about notifying me. Neither myself nor my wife signed any papers in reference to a compromise—my wife wasn't even present. I never authorized Mr. Walton to agree to give Mrs. Smith a judgment for the land she was claiming, including my improvements and the costs of court, and give me nothing; I never did agree to that.

"Something like twenty days after the judgment was rendered I saw Mr. Walton at his office; I come down here to see what he had done, and how come that, and to see another attorney. I come to see how come he gave a judgment like he did. I knew about the judgment from the letter he wrote to me. I got the letter something like twenty days afterwards; I have got the letter at home and aimed to bring it with me, but forgot it this morning. After I got the letter I came down here the next day and I asked him why he did it and he said that my son agreed to it, and then I went to see Mr. Peden, another lawyer, and he said it was too late. I wanted to employ him as my lawyer, but he said it was too late. Then me and my son went back home and I think we come back the next day and went to see Mr. Edgar Monteith and employed him, and Mr. Homer Stephenson come in the case with Mr. Monteith and they filed this suit for me.

"I saw Mr. Peden the same day that I came down here to see Mr. Walton, and then the next day I saw Mr. Monteith. Mr. Monteith took the case the first day I talked to him, and later Mr. Stephenson come in it. Mr. Monteith had some negotiations with Judge Amerman about a compromise, but I don't remember just when that was. It must have been a month or two after I employed him that he and Judge Amerman had an agreement. I don't know just how long it was after I employed him that Mr. Monteith discussed the matter with Mrs. Smith's attorney, but it wasn't many days I don't think. At one time they arrived at an agreement, but I don't know just when that was. I haven't got the date when it was reported to me. I can't estimate how long it was."

Further along Mr. Ferrell testified: "I said a while ago that I come to court several times; I made just one trip here to court, and that is all I made. Anyhow, about October, 1927, the case was set down for trial. I know what announcing ready for trial means. Both sides might have announced ready for trial, but I don't see how they could,—they had nary one of the witnesses summoned. After I came to court that time I employed Mr.

Gillespie to go out and survey that line and borrowed Mrs. Smith's abstract for the purpose of doing it. It is not a fact that after he came back to the court house I met him in the hall and asked him what he found and Mr. Gillespie said 'Do you want me to talk in the presence of the enemy?' That is not a fact; I didn't say any such thing. He never surveyed my land at all, but he went to the southeast corner of Mrs. Smith's and run up to this stob. I was there with him. When he came back to the court house I did not ask him what he had found. I did not in the court house just before the trial make the remark 'Well, when your surveyor goes back on you, what are you going to do; I am going away and you do the best you can.' I don't remember making any such remark as that. I couldn't say whether I did nor did not make such a remark, but I do not remember it. I did leave the court house and went to Mr. Walton's office, and from there I went home, and never came back for the trial."

The record shows that Mrs. Ferrell was not present in the court when the judgment was rendered, but from the entire record it is evident that her husband, B. W. Ferrell, had full authority to act for her.

From the above evidence, can we say that the Ferrells are free from negligence in failing to defend the suit in the first instance? We think not.

When we come to examine B. W. Ferrell's testimony, and we must construe it in the light most favorable to the last judgment, we find as a matter of law that it falls far short of excusing the Ferrells from any act of negligence in the matter of defending the suit of the Smiths. His testimony and the record show that both he and his wife were duly served and answered in the case; that the case was set for trial at a time they knew about; that B. W. Ferrell, who was looking after the matter, was present in court on the day it was set; that he had an attorney who had been employed by him who was also present; that there had been no witness summoned on his side; that he asked his attorney why he had no witness summoned, and was informed by him that he had no show, and there was therefore no use in summoning witnesses; that he did not remain to see whether the case would be tried or not, but left the courtroom. His testimony, taken as a whole, shows that he made no effort to ascertain what had been done with the case during the balance of the term.

The testimony of this witness then proceeds along lines which fail to show that the Smiths, or any attorney representing them, were guilty of any wrongdoing or fraud, but, on the other hand, negatives such conclusion. On the whole, we think Ferrell's testimony shows affirmatively, and as a matter of law, that he was guilty of negligence in failing to

summon his witnesses, and was not prepared for trial in the first instance, and that, when he found out these facts, and further found out that his own attorney was of the opinion that he had no defense to the action, he left the courtroom and did nothing to defend the suit. The record further shows that he made no effort to ascertain what had been done with the suit during the term, though he might easily have done so. Furthermore, there is absolutely nothing in this record to show that the Smiths or any one representing them did anything, either directly or indirectly, to cause the Ferrells to fail to prepare for the defense of the suit in the first instance, or to fail to defend it, or that they did anything to conceal the judgment from the Ferrells after it was entered.

In Goss v. McClaren, supra, which is one of the leading cases on the subject here under discussion, our Supreme Court had before it a case very similar to this. In that case the defendant sought to set aside a judgment after the term of court had expired. The excuse for not defending the suit was that defendant relied on the promise of his warrantor, who had promised to defend the suit. The warrantor failed to defend because he relied on his attorney, who had promised to do so. Judge Wheeler, speaking for our Supreme Court, reviewed the authorities, both English and American, at great length, and held: "Neither Courts of Chancery or of law ever interposed to afford relief, by granting a new trial, where a party had permitted a judgment to be recovered against him by his own supineness and negligence. His want of knowledge of evidence material to his defence, or of the recovery of a judgment against him where he was served with process, or of any other matter which it was material for him to know in order to make his defence, or apply in time for a new trial, has never been held to afford a party any excuse, if by the use of reasonable diligence he might have known it. The question, in such a case, said Lord Eldon, always is, not what the party knew, but what, using reasonable diligence, he might have known. (Daniell Ch. Pl. and Pr. 1734; [Cook v. De la Garza] 13 Tex. 445.) It cannot be doubted, that by the use of reasonable diligence, the petitioner might have known whether the suit pending against him, for the recovery of the premises on which he resided, was defended or not; or whether judgment was likely to be recovered or had been recovered against him, whereby he was liable to be ejected from his possessions. It would seem that a man of any prudence or discretion would have acquainted himself with such a state of case; if, indeed, he had any confidence in his title or his ability to make any successful defence to the action."

Later on in the same opinion Judge Wheeler, said: "In Mussina v. Moore (13 Tex. 7), and Kitchen v. Crawford (13 Tex. 516), the right of the party to a new trial was maintained on the ground, that where the defendant had been deprived of the opportunity of making his defence, without any fault on his part; he not having had personal service or actual notice of the suit; the Statute (Dig. Art. 783) gave him the right to a hearing, and a retrial of the case. But in the present case, the defendant had notice by personal service, and an opportunity afforded to defend the suit; but he did not, because he expected his warrantor to defend, and the latter did not, because he expected his attorney to attend to the matter. If the judgments of Courts were liable to be set aside, and new trials granted on such grounds as these, there would, indeed, never be an end of litigation. It has been well said, that, 'If mistakes in practice, or inadvertence furnished reason for a new trial, it would encourage litigation and reward ignorance and carelessness at the expense of the other party.' (6 Rep. 9.) And, therefore, the law in such cases wisely acts upon the maxim, interest reipublicae ut sit finis litium—it is for the public good that there be an end of litigation."

It has been well said that in ordinary cases the trial judge has a certain amount of discretion in granting new trials during the term. However, no such discretion can be exercised after the expiration of the term. The judgment then becomes a vested right which can only be divested by a direct proceeding filed for that purpose, and, when such a proceeding is resorted to, the person presenting the bill must bring himself strictly within the rules of law providing for relief in such cases. It is not enough that he plead and prove that he had a meritorious defense in the first instance, but he must go further and show that he was then free from negligence. In such case he is charged, as a matter of law, not only with what he knew during the term, but what he might have known had he used reasonable diligence. Goss v. McClaren, supra. Can it be said from this record that the Ferrells could not have known, by the use of ordinary diligence, what disposition had been made of the case of the Smiths against them, or that the Smiths or any one else representing them had done any wrongful act to conceal the original judgment? We think not.

We are always reluctant to reverse a case on the facts, but the security of government depends on the sanctity of judgments, and their enforcement according to the well-established rules of law. In this case we think the Ferrells have absolutely failed, as a matter of law, to discharge the burden cast upon them to excuse themselves from negligence in the first instance.

We recommend that the judgments of the district court and the Court of Civil Appeals be both reversed and the cause remanded to the district court for a new trial.

**CURETON, C. J.**

Judgments of both courts reversed, and the cause remanded, as recommended by the Commission of Appeals.

We approve the holdings of the Commission of Appeals on the questions discussed in its opinion.