Helen MONCUS, Individually and as Administratrix of the Estate of G. Frank Moncus, Deceased, et al., Appellants,

v.

GRACE OIL COMPANY et al., Appellees.

No. 12667.

Court of Civil Appeals of Texas.

Galveston.

Nov. 17, 1955.

Rehearing Denied Dec. 8, 1955.

376

Fred W. Moore, Raymond M. Hill, John P. Spiller, A. C. Lesher, Jr., and Lloyd N. Matthews, Houston, for appellants.

Sam W. Levy and Joyce Cox, Houston, for appellee Grace Oil Company.

Fulbright, Crooker, Freeman, Bates & Jaworski and Russell Talbott, Houston, for appellee Standard Accident Insurance Company.

CODY, Justice.

This suit was instituted in the probate court of Harris County by Mrs. Helen Moncus, in her own behalf and as administratrix of her deceased husband's estate and as guardian of the estates and persons of their three minor children. The proceeding was designated by the plaintiffs as a bill of review and had for its object the setting aside of the sale of certain mineral leaseholds and oil field equipment which had theretofore been sold by Mrs. Moncus as administratrix of her husband's estate pursuant to an order of the probate court. The probate court sustained special exceptions to plaintiffs' pleadings and ordered the proceedings dismissed. Plaintiff carried the proceeding to the District Court where she filed amended pleadings and ultimately went to trial on the third original amended petition.—The defendants were J. M. O'Melveny, L & O Drilling Company (in which company J. M. O'Melveny appears to have had the controlling interest), the Grace Oil Company and the Standard Accident and Insurance Company which had been on the administratrix, Mrs. Moncus' bond. The statement of facts on the main trial consists of seven large volumes and of an additional smaller volume which covered the hearing on the motion for a new trial.

We have attached hereto Exhibit A which contains the substance of the allegations of plaintiffs in the petition upon which they went to trial in the District Court.

The following facts appear not to be disputed, with the possible exception hereafter noted: Mr. Moncus died intestate as a result of an automobile accident on September 7, 1943. He was deeply involved, as will hereafter appear, at the time of his death and he had no cash on hand or in the bank. He owned, however, some leasehold interests in the Refugio oil field under two separate leases which had originally been executed by the Ryals heirs in favor of W. L. Pearson Properties. Six days preceding his death he bought from the Victoria Bank & Trust Company a work-over rig for $9,-500 and gave his note for the full amount payable in monthly installments of $1200 each, beginning October 5, 1943. The history of the two Ryals leases, so far as is here pertinent, is as follows:

The first lease was executed on December 9, 1929, and the other one on January 17, 1934. Each of these leases had "shut-down" clauses providing for the forfeiture of such lease if a well thereon is off of production for thirty days without being worked on. On November 3, 1942, the interest of the W. L. Pearson Properties in said leases was foreclosed under a deed of trust and the leasehold interest under said leases was bought in by the Victoria Corporation and on the following November 25th said Victoria Corporation mortgaged the leasehold interest it had so bought in to the Mercantile National Bank of Dallas for the exact sum for which it had bought the same in, namely $76,761.26, giving its note therefor, which bore interest at the rate of 5% per annum, payable monthly and containing the usual acceleration of maturity clauses. It was furthermore provided in the loan to the Victoria Corporation that all of the proceeds of the production from the wells on the Ryals leases should be paid over to the Mercantile National Bank of Dallas in reduction of the principal and interest of said note. Mr. Moncus, who had been engaged in the personal loan business and in the sale of carbon paper up until April 30, 1943, acquired the Ryals leases on that date and obligated himself to pay therefor $89,373.07, as follows: (a) by the assumption of the balance due on the aforesaid note to the Mercantile National Bank which then amounted to $69,373.07, and (b) $20,000 of which sum $9,000 was paid in cash and $11,000 thereof was evidenced by a note for $3,000 payable in 90 days and the balance thereof at the rate of $200 per month for 11 months, and the remainder at the end of a year. At the time that Mr. Moncus acquired the leases on April 30, 1943, the oil runs from the wells thereon seem to have been 2,300 barrels, in May the oil runs were 1,568 barrels, in June 1,807 barrels, in July 1,437 barrels, in August some 1,200 barrels, and in September approximately 1,200 barrels.

On the following September 28th Mr. Hay, attorney for Mrs. Moncus,[1] applied to the probate court of Harris County to have her appointed as temporary administratrix to the end that she could (a) preserve and operate the oil producing properties, (b) pay the necessary expense in connection therewith, and (c) be permitted to operate the drilling rig. The Honorable Roy Hofheinz, then County Judge of Harris County, granted the powers so requested. As stated above, Mr. Moncus died without any money on hand or in the bank, and it will be remembered that the proceeds from the oil runs from the wells then on the leases went directly to the Mercantile National Bank of Dallas, so that no funds could be realized therefrom to operate the wells on the leases or keep them in production and it was necessary to keep the wells in production under the "shut-down" clauses providing for forfeiture if a well was off of production for thirty days without being worked on. It was necessary, if the properties, including the drilling rig, were to be held by the estate, that money had to be raised and the drilling rig put to earning money and the wells kept in condition. It appears that Mr. Hay, Mr. Moncus and Mr. O'Melveny conceived the idea of working out some sort of partnership arrangement by which Mr. O'Melveny would keep the wells producing so far as possible and put up the money for the necessary labor in that connection and for the operation of the rig; and Mr. O'Melveny, from the time shortly after the death of Mr. Moncus, stepped in and proceeded to operate the properties and operate the leases and the drilling rig and advance the money therefor not only during the time that Mrs. Moncus was temporary administratrix with the powers stated above, but up until the time that the property was sold, as hereinafter stated. This arrangement, which included advancing moneys, was done informally and without the prior authorization by the court to incur indebtedness and to pay off the indebtednesses which had been incurred dur-

1. Mrs. Moncus appears to question that Mr. Hay was her attorney but she made no issue of the point on the trial and we hold under the record before us that Mr. Hay was her attorney.

ing the life of Mr. Moncus. On May 10, 1944, Judge Hofheinz ordered the leases and all personal property of the estate sold, and on the same date the administratrix reported that she had made the sale to O'Melveny for a fair price of $84,697.47, as follows:

1. Assumed balance due W. F. Wllace and D. E. Blackburn; this note was originally held by the Huss State Bank, Hull, Texas $4,173.00

The Estate to be released from any further liabilities from this obligation

2. Assumed balance due the Mercantile National Bank of Dallas, Texas 46,047.52

The accrued interest on this obligation is not included in these figures which is also assumed.

3. Assumed balance due Victoria Corporation, Corpus Christi, Texas 7,400.00

Accrued interest 296.00

The estate is to be released from all liabilities on this obligation.

4. Assumed balance due Victoria Bank and Trust Company of Victoria, Texas 5,900.00

The estate is to be released from all liabilities on this obligation.

5. Lane Well Supply Company, Houston, Texas 1,100.00

6. Heard & Heard Truck Company 600.00

7. Carpenter for wages due him. 500.00

8. Dowell 615.00

Purchaser, J. M. O'Melveny, as shown in the exhibit attached to the original application claims loss in operation 3,656.95

Purchaser paid on note due by the estate for rig to Victoria Bank and Trust Company 3,600.00

The purchaser has agreed that these two claims be cancelled totalling $7,256.95 as part of the consideration for this sale and the administratrix Helen Moncus, has approved and agreed that same be cancelled subject to the approval of the Court.

Purchaser, J. M. O'Melveny is to pay cash $ 500.00 and execute a note for the sum of not less than 10,327.00 payable at the rate of $200.00 per month, the first being due and payable on or before the 5th day of May, A.D. 1944, and a like amount on the 5th day of each month thereafter until said note is paid in full. The Administratrix is to retain a Vendor's Lien Note and Deed of Trust to secure said indebtedness.

Subsequently when all of the payments assumed by O'Melveny were paid off, as reported to the probate court by the administratrix, the then County Judge, Judge Perry, duly confirmed the sale. This seems to have been the extent of the orders of the probate court relative to the transactions between O'Melveny and the estate, as well as the extent of the orders relative to paying off the indebtednesses which had been incurred by Mr. Moncus during his lifetime. The complaints of the plaintiffs were to the effect that no proper accounting had been made by J. M. O'Melveny to the administratrix but no issue thereon was submitted to the jury and it is undisputed that O'Melveny did pay off the obligations assumed by Mr. Moncus during his lifetime. We digress here to state that as we understand the record, O'Melveny suffered a net loss out of the transaction, of $18,000, at least until the time he or the L & O Drilling Company sold the properties to the Grace Oil Company, which company spent some $60,000, seeking to get production, and hit a stringer sand which made the two wells, which were in production at the time this present proceeding was instituted, valuable properties.

The plaintiffs had the case submitted to the jury on a single issue, which reads as follows:

"Do you find from a preponderance of the evidence that the amount J. M. O'Melveny paid and promised to pay for the properties described in the Order of Sale of the County Court of Harris County, Texas, was at the time of such sale a grossly inadequate consideration for the properties in question?" To which the jury answered "No."

However, the plaintiffs objected, as will hereafter appear, to the definitions which accompanied said special issue.

Judgment was rendered against plaintiffs and in favor of the defendants. The plaintiffs will hereafter be referred to as appellants and the defendants will hereafter be referred to as appellees. Appellants moved for judgment notwithstanding the verdict and also moved for mistrial, both of which were refused. We have been favored on this appeal by briefs only from appellants and briefs from the appellee, Grace Oil Company, and appellee, Standard Accident and Insurance Company.

Appellants predicate their appeal upon 20 formal points covering more than six pages of their brief. While it is thus made impossible to rule on all of their points expressly, we will rule upon the cardinal issues made in the case and upon such express points as are not necessarily determined by the rulings upon the cardinal issues in the case.

### Opinion

■ The probate court, within the limits of its jurisdiction, is a court of general jurisdiction. As such it has power to entertain an equitable bill of review. That is to say, it can set aside its orders or judgments after they become final upon the same terms and conditions that a court of equity could set aside a judgment of a court of law, after such judgment became final. In addition, in guardianship matters, the probate court has conferred upon it by Article 4328, Vernon's Ann.Tex.St., the power to consider a statutory bill of review whereby the court is empowered to set aside any decision, order, or correct same. And with respect to such statutory bill of review it is well settled that the rules applicable to an equitable bill of review do not apply. Norton v. Cheney, 138 Tex. 622, 161 S.W.2d 73; Pure Oil Co. v. Reece, 124 Tex. 476, 78 S.W.2d 932; Jones v. Sun Oil Co., 137 Tex. 353, 153 S.W.2d 571. The authorities which appellants cite, and apparently rely on, seem to indicate that appellants consider that the statutory bill of review, applicable to orders in guardianship matters, authorized and required the court below to set aside the order of sale to O'Melveny after it became final, because of irregularities or failure to comply with the statutes applicable to the claims against the estate of the decedent, Mr. Moncus, and the sale of property belonging to such estate.

■■ Such position is not tenable. See Union Bank & Trust Co. of Fort Worth v. Smith, Tex.Civ.App., 166 S.W.2d 928, 931 (no writ history), where it is held: "If the orders, judgments and decrees were erroneously made, their remedy was to appeal. Smith v. Ferrell, Tex.Com.App., 44 S.W.2d 962. This was not done, nor does it appear that they were prevented from doing so by the act of any one or more of those of whom they now complain. An equitable Bill of Review may not be substituted for an appeal." The court then went on to state the kind of fraud for which courts of equity are authorized to set aside judgments.—It is no light thing to set aside a final judgment. Rights become vested thereunder. And a court of equity will only divest a vested legal right if an equitable bill of review will lie for that purpose.

■ For purposes of this appeal we have concluded that this is a direct attack upon the order of sale. This because same was instituted in the same court, and because all of the parties to the sale, and their privies, have been made parties to this

proceeding, namely, the administratrix and the children of herself and Mr. Moncus, O'Melveny and his Drilling Company, the Grace Oil Company, and the surety on the administratrix' bond. It may be argued that the · Ryals heirs are privies because some of the land under lease during the time of the sale was allowed to revert to said heirs as being valueless for the purpose for which it was leased (though since then a producing well appears to have been brought in on a piece of such reverted land). But we do not see how it could lie in the mouth of appellees to contend that the Ryals heirs were privies that had to be made parties to this proceeding.

■ In this connection it should be noted that after the sale and its ratification by the court has become final, it is too late to complain that claims had not been approved by the court, and to complain of errors generally which the court may have committed. In Lyne v. Sanford, 82 Tex. 58, 19 S.W. 847, the Supreme Court held that where the application for sale set out the property to be sold for the purpose of paying debts, and the court granted such order of sale, such action was tantamount to an approval of the claim by the administrator, and by· the court. In Heard v. Vineyard, Tex.Com.App., 212 S.W. 489, 490, 492, the court held that it was immaterial that at the date of the application and order of sale the claim had not been established, when in fact such claim was then due and payable. Said the court further, "The court had full and complete jurisdiction, and was empowered to order a sale of lands belonging to the estate for the payment of debts of the estate. * * * The statute · does not limit the exercise of the power to claims established against the estate, when the application is made by an administrator or executor. *The test is not the establishment, but the existence of the claim.*" (Emphasis supplied). While the case just quoted from was a direct attack, that fact makes no difference because here appellants' bill lacks the necessary equity to entitle them to set the sale aside. The burden was on appellants in all events to establish the elements of the invalidity of the sale. Appellants did not submit any issues thereon to the jury.

■ We have considered appellants' objections to the court's charge, and find same do not constitute reversible error. From the record we have concluded that the court did not refuse to allow appellants to show the consideration for O'Melveny's contracts and conveyances.

■ It was made to appear that when the case was submitted to the jury a duplicate of the court's charge, instead of the original copy, was given to the jury, and further, that a juror encircled by a pencil mark the word *grossly* in the court's charge, while the jury were deliberating. · Such did not constitute reversible error.

Without further extending this opinion, we think it sufficient to state that we have considered all of appellants' points, and rule that no reversible errors were committed.

The judgment is affirmed.

GANNON, J., not sitting.

### Exhibit A

Plaintiffs alleged that the aforesaid sale violated the Texas statutes as follows:

(1) The application to sell the properties (filed in April, 1944) which consisted not only of mineral leasehold interests in Refugio County, Texas, but also various oil well machinery, pipes, rigs, derricks and other personal property, violated Article 3566 in that, (a) various charges or claims existed against the estate which were not mentioned in the exhibit attached to the application, (b) there was no attempt made to estimate the expenses of the administration in the exhibit, (c) the exhibit attached to the application did not set out the property of the estate remaining on hand, (d) that the application had attached to it a list of jobs performed by O'Melveny in the handling of said drilling rig which

had never been authorized or approved by the probate court and which represent an unlawful partnership activity;

(2) The order of sale did not specify the terms thereof, but simply provided that the real and personal property be sold by the administratrix "at private sale and make a report thereof within thirty days after the sale has been made." Ordinarily, there being no specification in the order as to whether the sale should be made for cash or on credit, it would have been made for cash. In any event, under Article 3572 if made for credit, one-fifth of the purchase price (more than $16,000) should have been paid in cash instead of $500 and instead of a lien having been taken only for $10,327, payment of the balance of the purchase price should have been secured by a lien;

(3) The application to sell the property discloses that it was an attempted sale to satisfy various claims arising both before and after the death of Frank Moncus which claims were never, at any time, presented to the administratrix or approved by the court, that is, the conveyance was a direct sale to O'Melveny to pay his claims, which had never been presented, allowed or approved. He alleged that he had paid off some obligations due by Moncus and that he had suffered losses from the handling of a drilling rig owned by Moncus and that consequently he ought to have the said mineral leasehold estate and all the personal property connected therewith to satisfy his unapproved claim;

(4) That O'Melveny perpetrated a fraud upon the administratrix and her minor children in that he did not pay in full all the obligations that he assumed or agreed to pay and that his claim of $5,915.89 for work done on said mineral leasehold was a void and fraudulent charge because said work had never been authorized by the probate court;

(5) That no sales bond was filed in connection with said sale as is required by Article 3576;

(6) That the purchase price of $84,697.47 was inadequate as said properties were reasonably worth more than $250,000 and that more than $250,000 in oil was produced from said properties after said alleged sale.