**BURGUIERES v. FARRELL et al. ***
No. 13199.

Court of Civil Appeals of Texas.
Fort Worth.

On Motion to Disqualify June 7, 1935.
Opinion June 28, 1935.

Rehearing Denied Sept. 6, 1935.

judgment of the district court of the Ninety-Sixth judicial district, denying her petition in the nature of a bill of review to set aside that portion of a judgment theretofore rendered by the same court in a former suit by her for divorce against her former husband, John E. Farrell, in which she was divested of her interest in the community estate of herself and said Farrell and same vested in him in accordance with a written agreement of the parties to that suit on file therein; and also to cancel said written agreement. The grounds for that relief are set out in her petition in the nature of a bill of review. That appeal is now pending in this court. As shown by allegations in plaintiff's petition, the former suit for divorce and property settlement, instituted by her, was tried before Hon. Hal S. Lattimore, the regular elected judge of said court, who granted the divorce and also decreed the property settlement now complained of. After the divorce was granted, plaintiff married again to Alfred L. Burguieres, but she was by order of court given leave to institute and prosecute her present suit to set aside the former judgment of property settlement in her present married name of Stella Burguieres without joinder by her husband. But no effort was made to set aside the decree of divorce. As shown by the record, the suit now on appeal was tried before Hon. Marvin H. Brown, who had succeeded Hon. Hal S. Lattimore as judge of the same court. Both of said judges are now associate justices of this court; and appellant has filed a motion to disqualify Justice Lattimore from acting as one of the justices in the disposition of the appeal which is now pending.

The facts alleged in and made the basis of the motion to disqualify were developed in the trial of the case now on appeal and relate to what occurred after judgment in the divorce case had been entered and are as follows:

"Motion for new trial by defendant J. E. Farrell.

"Now comes the defendant and says the judgment in this cause is erroneous and should be set aside for the following reasons:

"(1) The evidence submitted to the court was not sufficient to justify a divorce and did not show any grounds therefor.

Slay & Simon, of Fort Worth, for appellant.

Cantey, Hanger & McMahon, Mark McMahon, Gillis A. Johnson, and Warren Scarborough, all of Fort Worth, for appellees.

On Motion to Disqualify Justice H. S. Lattimore.

DUNKLIN, Chief Justice.

In the above-entitled suit Mrs. Stella Burguieres has prosecuted an appeal from a

954

"(2) The judgment was procured by fraud on the part of the plaintiff in that the plaintiff induced the defendant to believe that her grief caused her to wish a separation in order that she might compose her mind and consider further what her relations to plaintiff would be when, in fact, plaintiff only wanted a divorce, knowing that she had no grounds therefor, in order to embarrass the defendant by seeking marriage with another.

"Wherefore defendant prays for a new trial.

"[Signed] J. E. Farrell."

Testimony of Judge Lattimore given on the trial of the present suit to set aside the property settlement:

"Q. Now, I'll ask you if John Farrell came to see you, or if you saw him anywhere else after the divorce was granted, and, if so, when? A. Well, the next time I saw Mr. Farrell was later, I can't say how soon. I know it was less than ten days because of what I shall relate, but I can't give you the exact number of days that it was after the divorce hearing. He came to my office there, and he said that he was not willing for this settlement, this property judgment, to stand, and wanted to talk to me about it.

"Q. Did he say why he didn't want it to stand? A. Yes.

"Q. Tell the jury what he said. A. He said that he had some information that his wife had formed some attachment and relation for a man in New Orleans, and that he felt like her property would be dissipated, and that he was going to—he felt like the decree ought to be set aside, and some steps taken to protect it.

"Q. Did he give any reasons why, other than that, about the New Orleans man? A. Yes.

"Q. What was it? A. Well, he said that— * * *

"A. He said he had understood that she was planning to get married to a man in New Orleans, who would simply live off of what he got from what Mrs.—the Mrs. Farrell had. I can't pronounce that name and hence don't attempt it—that he would simply live off of what the then Mrs. Farrell would get from this marriage settlement, and that he was not going to have that fellow living off of his money.

"Q. You say that was within the ten days as provided by statute for a new trial? A. Yes.

"Q. Was anything further said? A. Yes, he said, 'I want to know what to do about it.' And I said, 'Well, you had better go and consult your lawyer.' And he said, 'I don't have any.' And I said 'well, you don't have any lawyer'. He said, 'No, Mr. Zweifel was agreed on by us to handle this divorce matter, and I don't have a lawyer.' And I said, 'well, you had better file a formal motion for new trial, which must be filed within ten days, and then you can get you—go and get you a lawyer, and he will amend it, and get it up in shape that it can be presented, if it is any good.' And he said, 'I don't know how to do that'. And I took up my pencil and sketched off the elements that must be in to make a motion for new trial. And I said, 'go down and write up something that embody these elements, and file it, and it will be sufficient to hold the thing until you can get you a lawyer, and amend it, and set up in whatever shape you want it to be in, if one can be presented that will be good.'

"Q. That was in order to have something on file before the ten days was up? A. Yes, the law requires a motion for new trial to be filed in ten days, and an amendment can be made thereafter setting up what you really want.

"Q. Do you know how much more time he had before the ten days would have elapsed? A. Well, I just don't remember. But I do remember that the time was so short it was apparent that he would have to do something pretty promptly, but I couldn't attempt to say within hours or even days of when it was."

Testimony of J. E. Farrell:

"Mr. Slay: Now, Mr. Farrell (exhibiting defendant's exhibit 23 to the witness), this exhibit, the motion for new trial you testified about, examine it, so you will know what I am talking about, please, sir. A. Yes, that is it.

"Q. I believe you said you dictated that yourself, or wrote it, on the machine yourself? A. I wrote it on the machine. Judge Lattimore dictated it for me, wrote it out. It was last day and I didn't have any more time.

"Q. You say Judge Lattimore dictated it to you? A. He told me the high-lights about it.

"Q. He told you the high-lights about it, and you went down and put it on the machine yourself, and wrote it up yourself? A. Yes, sir.

"Q. He didn't give you a written memorandum, though, of what to put in, did he? A. Just on these two points here.

"Q. Did he write it down for you? A. Yes, in pencil.

"Q. Or did he just tell you? A. Yes, he told me and wrote it down in pencil for me.

"Q. Oh, did he write it out in detail like it is here? A. Well, I couldn't say that, whether he wrote it out in detail.

"Q. Tell this jury whether or not you wrote that yourself, or whether he gave you the points and wrote it yourself, or whether he wrote it, and then you copied it. A. No, he gave me the points in pencil, and then I took this down to the office and wrote it myself. You will find that you will find those letters which are written to' Sis, you will find it is the same type.

"Q. Now, who made the endorsements and put the number on the back of it? A. I don't know who did that."

Article 5, § 11, of the Constitution reads: "No judge shall sit in any case wherein he may be interested, or where either of the parties may be connected with him, either by affinity or consanguinity, within such a degree as may be prescribed by law, or when he shall have been counsel in the case. When the supreme court, the court of criminal appeals, the court of civil appeals, or any member of either, shall be thus disqualified to hear and determine any case or cases in said court, the same shall be certified to the governor of the state, who shall immediately commission the requisite number of persons learned in the law, for the trial and determination of such cause or causes."

In support of the motion now before us, appellant has cited decisions in which it was held that trial judges were disqualified to try cases because prior to the time the same were tried they had to some extent acted as counsel in advising the litigants in matters involved in those cases. Among the cases cited are the following: Slaven v. Wheeler, 58 Tex. 23; Barnes v. State, 47 Tex. Cr. R. 461, 83 S. W. 1124; Durham v. State, 58 Tex. Cr. R. 143, 124 S. W. 932; Johnson v. Johnson (Tex. Civ. App.) 89 S. W. 1102.

In Gaines v. Hindman (Tex. Civ. App.) 74 S. W. 583, this was said:

"Appellant, who was constable of a precinct, sued appellee, who was the sheriff of Palo Pinto county, to recover a portion of a reward paid to the latter by the United States government for the arrest and conviction of certain persons who had robbed a post office in that county. The cause was first tried in the justice court, where appellant had judgment, and subsequently appealed to the county court, where the judgment was for appellee, and the constable appeals.

"We are inclined to think the county judge who tried the case was disqualified under article 1129 of Sayles' Ann. Civ. St. 1897. At the request of the sheriff's deputy, the county judge prepared a motion for new trial in behalf of appellee in the justice court, and, while he states that he knew nothing of the facts of the case, and of course did not understand that he was the counsel of appellee, nevertheless he was to that extent performing the functions of counsel, and the courts should not be required to investigate the extent of the services of one who thus acts in that capacity."

However, following that announcement, the judgment of the trial court was reversed because of an erroneous instruction to the jury.

It is our conclusion that the action of Judge Lattimore with respect to the motion for new trial in the divorce case was within his general discretionary powers to accord to J. E. Farrell the benefit of a legal right, of which he was ignorant, and concerning which he had no attorney to advise him. It in no manner affected the judgment that had been rendered in the case already. Nor did J. E. Farrell file an amended motion for new trial, or invoke any ruling of the court on his original motion, filed at Judge Lattimore's suggestion, which, therefore, was overruled by operation of law. And Farrell did not prosecute an appeal from the decree in the divorce case. If an appeal had been prosecuted by the plaintiff in that case, we believe it clear that such action of Judge Lattimore could not have been held reversible error. Nor was the same alleged as a ground for setting aside the decree of property settlement. The argument of appellant in support of the motion to disqualify is based solely on the contention that the ad-

956

vice given to Farrell by Judge Lattimore was necessarily in the capacity of counsel, and therefore shows his disqualification to sit in the determination of this appeal; with this further statement in connection with that argument: "We disclaim any thought or notion of attributing to Judge Lattimore anything but the very best intentions in his advice and counsel to the appellee Farrell."

We cannot concur in this view. It is our conclusion that if, as we believe to be true, the action of Judge Lattimore complained of was not an abuse of his judicial discretion in the disposition of the divorce suit, it would be illogical and contradictory to now hold that such advice was beyond the discretionary powers of the judge and constituted advice of counsel to client and therefore showing disqualification of Judge Lattimore to participate in the determination of this appeal. We believe our conclusion finds support in the general principles announced in 64 C. J. pp. 66 and 101; 3 Tex. Jur., § 760, p. 1079; 25 Tex. Jur. pp. 288–293, and that the decisions cited by appellant are not controlling here because of the distinguishing facts on which they were based, in that the disqualifying circumstances there involved occurred prior to the trial of the cases and in most instances before the election of the judge trying them.

■ And it is well settled that a judge of an appellate court is not disqualified to determine the merits of an appeal because the judgment appealed from was rendered by him as a trial judge. Galveston & Houston Inv. Co. v. Grymes, 94 Tex. 609–615, 63 S. W. 860, 64 S. W. 778.

Accordingly, the motion to disqualify Judge Lattimore is overruled by the majority of this court. And we will add that he has taken no part in this disposition of the motion.

## Opinion.

■ On the 8th day of August, 1931, the district court for the Ninety-Sixth judicial district granted Mrs. Stella B. Farrell a divorce from John E. Farrell and as a part of the same decree entered judgment settling the property rights between them in accordance with the written agreement of the parties then on file, plaintiff having prayed for a division of the community property.

Following the decree dissolving the marriage relation between the parties, the judgment, after reciting the terms of the agreement, was as follows:

"It is further ordered, adjudged and decreed by the court that defendant shall pay to plaintiff the sum of Seven Hundred Fifty ($750.00) Dollars per month so long as plaintiff shall live, such payment to be due and payable on the first day of each and every succeeding month.

"It is further ordered, adjudged and decreed by the court that the defendant recover of and from the plaintiff as his own separate property all of the property, real, personal and mixed belonging to the community estate of plaintiff and defendant, and that said property of said community estate shall be and become the sole and separate property of the defendant, and any and all right, title and interest in and to said property now belonging to said plaintiff, or which might or could be claimed by her, shall vest in and belong to the defendant, and the plaintiff shall, upon demand, execute and deliver to said defendant good and valid assignments or conveyances for any or all of such property conveying fee simple title to defendant."

Following is that agreement of the parties:

"State of Texas, County of Tarrant

"Whereas, John E. Farrell and Stella B. Farrell were united in marriage at Fort Pierce, Florida, on or about the 19th day of April, 1920, and lived together as husband and wife until about the 1st day of March, 1931; and

"Whereas, during the time said John E. Farrell and Stella B. Farrell lived together as husband and wife they acquired certain real and personal property which comprises their community estate and which is not susceptible of partition; and

"Whereas, on the 8th day of July, 1931, the said Stella B. Farrell filed her petition in the 96th Judicial District Court of Tarrant County, Texas, praying that the marriage relation between herself and the said John E. Farrell be dissolved, and said John E. Farrell and Stella B. Farrell have agreed that in the event said marriage relation is dissolved by judgment of said court as prayed for in said petition, in lieu and instead of a partition of said community estate the said John E. Farrell shall pay to the said Stella B. Farrell the

sum of Seven Hundred Fifty ($750.00) Dollars per month so long as she shall live, and the said Stella B. Farrell shall transfer, assign and convey unto the said John E. Farrell all her right, title and interest in and to said community estate; now, therefore,

"This Agreement, made and entered into this 8th day of July, 1931, by and between John E. Farrell and Stella B. Farrell, of Tarrant County, Texas, .

"Witnesseth: That said John E. Farrell, for and in consideration of the premises and of the promises and agreements hereinafter contained on the part of the said Stella B. Farrell to be made, kept and performed, has agreed and does hereby agree to pay to the said Stella B. Farrell the sum of Seven Hundred Fifty ($750.00) Dollars on the first day of August, 1931, and the sum of Seven Hundred Fifty ($750.00) Dollars on the first day of each and every month thereafter so long as she shall live, said payments to be made by the said John E. Farrell to the First National Bank of Fort Worth, Texas, with instructions to said bank to promptly pay the same to said Stella B. Farrell, and for the purpose of guaranteeing such payments the said John E. Farrell has agreed and does hereby agree to deposit in trust with said First National Bank the sum of Twenty Thousand ($20,-000.00) Dollars in cash and two hundred (200) shares of the capital stock of United States Steel Corporation, of the approximate present value of Twenty Thousand ($20,000.00) Dollars, provided that said John E. Farrell shall have the right at any time to withdraw said shares of stock from said bank upon depositing with said bank the further sum of $20,-000.00 in cash in lieu thereof, and provided further that said First National Bank shall have the right to sell said shares of stock for cash in the event it becomes necessary to convert said shares of stock into cash for the purpose of meeting any of the payments herein provided for, and in the event said John E. Farrell fails to make any of the payments herein provided for, such payments shall be made by said bank to said Stella B. Farrell out of such trust fund, and in such event said Stella B. Farrell shall have the right to require the said John E. Farrell to deposit the amount of such payment or payments with the said First National Bank in order that said trust fund shall at all times

be maintained at the sum of Forty Thousand ($40,000.00) Dollars or at the sum of Twenty Thousand ($20,000.00) Dollars and said two hundred (200) shares of the capital stock of United States Steel Corporation.

"In Consideration whereof said Stella B. Farrell has agreed and does hereby agree that all property, real, personal and mixed, belonging to the community estate of the parties hereto, shall be and become the sole and separate property of the said John E. Farrell, and any and all rights, title and interest in and to said property now belonging to said Stella B. Farrell, or which might or could be claimed by her, shall be, and the same hereby is transferred, assigned and conveyed unto said John E. Farrell, free from any and all liens or claims on the part of said Stella B. Farrell, and, for the same consideration, said Stella B. Farrell has agreed and does hereby agree that she will, upon demand, execute and deliver to said John E. Farrell good and valid deeds, assignments or conveyances for any and all of such property conveying the fee simple title therein to said John E. Farrell.

"In witness whereof, we have hereunto set our hands this 8th day of July, 1931.
"[Signed] John E. Farrell
"[Signed] Stella B. Farrell."

That agreement was duly acknowledged by the parties, Mrs. Farrell's acknowledgment being in accordance with statutory requirements for acknowledgment by a married woman.

Prior to the institution of the divorce suit, John E. Farrell had acquired oil leases in Gregg county and he and his associates had assigned same to the Yount-Lee Oil Company by contract in writing, dated March 11, 1931. The interest so acquired by Farrell belonged to the community estate of himself and wife when the divorce suit was instituted on July 8, 1931, and when the judgment was rendered on August 8, 1931, and the following are the pertinent portions of that assignment:

"State of Texas, County of Jefferson, Know All Men by These Presents:

"That we, J. E. Farrell, acting herein by and through W. A. Moncrief, his duly authorized Attorney-in-fact, and W. A. Moncrief, individually, W. S. Noble and R. S. Baker, all of Tarrant County, Texas, and E. A. Showers, of Dallas Coun-

ty, Texas, hereinafter called Grantors, for the consideration hereinafter set forth, have granted, sold, conveyed, transferred and assigned, and do by these presents grant, sell, convey, transfer and assign unto the Yount-Lee Oil Company, a corporation duly incorporated under the laws of the State of Texas, with its principal office at Beaumont, Jefferson County, Texas, the following described oil, gas and mineral leases, (together with all physical property and/or equipment belonging to Grantors located thereon except one drilling rig and equipment connected therewith covering the hereinafter described lands in Gregg County, Texas, towit (here follows description of various tracts aggregating 2,679.36 acres, but which, as the evidence shows, when they were surveyed aggregated 2,559.3 acres).

"The consideration for this transfer and assignment of said above described oil, gas and mineral leases is as follows:

"(a) The Sum of Nine Hundred Fifty-Seven Thousand Five Hundred ($957,-500.00) Dollars cash, receipt of which is hereby acknowledged by Grantors.

"(b) One Hundred Thousand ($100,-000.00) Dollars due and payable on May 1st, 1931; One Hundred Thousand ($100,-000.00) due and payable on July 1st, 1931; and One Hundred Twelve Thousand Five Hundred ($112,500.00) Dollars due and payable on September 1st, 1931; said amounts payable at the First National Bank of Longview, Texas, and to bear interest at the rate of six (6%) per cent per annum from maturity.

"(c) Two Million ($2,000,000.00) Dollars to be paid out of one-fourth (¼) of said Yount-Lee Oil Company's working interest in the oil and/or gas produced and saved from the lands covered by this assignment, if, as and when produced and saved only in such event, free of all cost and expense to Grantors; it being expressly understood in this connection that said Yount-Lee Oil Company shall be under no obligations to Grantors to drill upon or develop said lands, or any part thereof, for oil and/or gas except to drill such off-set wells as a reasonably prudent operator would drill to protect said lands from drainage, but said Yount-Lee Oil Company shall not, so far as Grantors are concerned, be required to off-set any well unless such well is within one hundred and fifty (150) feet of the boundary line of said property and

producing oil in paying quantities. In no event, so far as grantors are concerned, shall said Yount-Lee Oil Company be required to off-set wells drilled by it on any of said lands or to drill an off-set well on any land where the title is in dispute. It is further understood that said Yount-Lee Oil Company shall be under no obligations by reason of the contingent oil payments herein provided, to keep any of said leases in force but said Yount-Lee Oil Company agrees to re-assign by the payment of rentals or drilling operations, fifteen (15) days before the maturity date of such rentals or drilling operations; said above consideration to be pro-rated between Grantors on the following basis:

"J. E. Farrell—50% (Fifty per cent)

"W. S. Noble—18¾% (Eighteen & three-fourths per cent)

"W. A. Moncrief—12½% (Twelve and one-half per cent)

"E. A. Showers—12½% (Twelve and one-half per cent)

"R. S. Baker—6¼% (Six and one-fourth per cent). * * *

"In the event the acreage covered by this assignment does not amount to as much as two thousand three hundred and fifty (2,350) acres of land as measured on the ground, or on account of failure of title to any of said land or invalidity of any of said leases said acreage is reduced below two thousand three hundred fifty (2,350) acres, then said Yount-Lee Oil Company shall be entitled to a refund for each acre necessary to make up said two thousand three hundred fifty (2,350) acres on the basis of Five Hundred Twenty & 83/100 ($520.83) Dollars in cash per acre and a reduction (or refund) of Eight Hundred Thirty-Three & 33/100 ($833.33) dollars per acre from the consideration to be paid out of oil; and the fact that said Yount-Lee Oil Company may have knowledge, at the time of the acceptance of this assignment, of the defects in title causing such shortage shall not relieve Grantors of their obligation hereunder.

"In the event of adverse claims, by suit or otherwise, involving the validity of any of the leases herein assigned or the title to any of the land covered by same, which, if sustained, would reduce said acreage below two thousand three hundred fifty (2,350) acres, then said Yount-Lee Oil Company shall be entitled

to withhold from the payment provided for in subdivision 'b' above, the sum of Five Hundred Twenty & 83/100 ($520.-83) Dollars in cash per acre, for each acre so involved, and the sum of Eight Hundred Thirty-Three & 33/100 ($833.-33) Dollars per acre, for each acre so involved, from the oil payment provided for in subdivision 'c' above, until Grantors remove the cloud on the title to such acreage created by said claims or suits."

On the fourth day after the judgment in the divorce suit was rendered, Mrs. Stella B. Farrell married Albert B. Burguieres, and on November 2, 1931, she and her said husband executed a written agreement, which was duly acknowledged by them according to statutory requirements, reciting the execution of the Yount-Lee assignment contract, of date March 11, 1931, and John E. Farrell's interest therein as stipulated; also the execution of the property settlement agreement made by them on the day the divorce suit was instituted, the rendition of the judgment thereon, with specific ratification of that judgment and all those documents, and concluding as follows:

"Now, therefore, I, Stella B. Burguieres (formerly Stella B. Farrell) joined herein pro forma by my husband, Albert Burguieres, of New Orleans, Louisiana, in consideration of the premises and of the sum of Ten ($10.00) Dollars to me in hand paid by John E. Farrell, and other good and valuable considerations, the receipt of which is hereby acknowledged, do hereby convey, transfer, assign and release unto the said John E. Farrell all of my right, title and interest (including my community interest as the former wife of the said John E. Farrell) in and to all amounts heretofore paid or hereafter to be paid by said Yount-Lee Oil Company under the terms and provisions of the above mentioned assignment from John E. Farrell et al. to said Yount-Lee Oil Company, of date March 11, 1931; and I hereby fully release said Yount-Lee Oil Company from any obligation to account to me for any amount due or to become due (whether payable in cash or out of the proceeds from oil) under the terms and provisions of the above assignment from the said John E. Farrell et al. to said Yount-Lee Oil Company. I further hereby convey, release and quit-claim unto the said John E. Farrell any and all rights, claims and demands, of whatever nature, to which I may be entitled in, under or in any way connected with said assignment of date March 11, 1931, above mentioned.

"And for the consideration above mentioned, I do hereby ratify and confirm all of the provisions of the above-mentioned contract and agreement made and entered into between me and the said John E. Farrell on July 8, 1931, under the terms of which I conveyed to the said John E. Farrell all of my right, title and interest in and to all property, real, personal, and mixed, belonging to the community estate of the said John E. Farrell and myself.

"Executed at New Orleans, Louisiana, this the 2nd day of November, A. D. 1931.

"[Signed] Stella B. Burguieres
"Albert L. Burguieres."

Prior to the execution of that instrument, Mrs. Stella B. Burguieres had executed an instrument, of date October 20, 1931, in practically the same terms, but she executed it in her own name without the joinder of her husband and the foregoing instrument was executed to cure that defect. Both of those instruments were executed at the request of the Yount-Lee Oil Company to avoid any possibility of a subsequent claim by Mrs. Burguieres of an interest in the lease. In other words, in order to make sure of its title; and at that time the Yount-Lee Oil Company demanded the execution of that instrument before making any further payments on the lease. Mrs. Stella Burguieres and her husband also executed and delivered to John E. Farrell two quitclaim deeds to the property in Fort Worth which was formerly the homestead of John E. Farrell and Stella B. Farrell, those instruments reciting that they were executed in fulfillment of Mrs. Farrell's obligation to execute the same as stipulated in the property settlement agreement. The first of those quitclaim deeds was executed on August 20, 1931, and signed "Stella B. Farrell" instead of her married name, and acknowledged by plaintiff as a feme sole. The second of those quitclaim deeds was dated November 24, 1931, and was executed by Mrs. Stella B. Burguieres and her husband, Albert L. Burguieres, and duly acknowledged in accordance with statutory requirements.

On the 5th day of July, 1933, Mrs. Stella B. Burguieres, without the joinder of her husband and with permission of the

court, instituted this suit against John E. Farrell and the Yount-Lee Oil Company to set aside that judgment divesting her of her rights in the community estate belonging to herself and her former husband, upon allegations that the only evidence upon which that judgment was rendered was the written agreement of the parties to the suit, and that she was induced to enter into that agreement by fraudulent misrepresentations made to her by John E. Farrell with respect to her interest in the community estate; and, as shown by allegations in her petition and evidence offered on the trial of the suit, the chief purpose of her suit was to recover an undivided one-half interest in the contract of assignment to the Yount-Lee Oil Company and the proceeds already accrued and to accrue therefrom; and to that end the Yount-Lee Oil Company was made a party defendant along with John E. Farrell. In plaintiff's petition she further sought to set aside the other instruments in writing, noted above, purporting to ratify the judgment and the property settlement agreement upon which it was rendered, on allegations that she was induced to enter into the same by reason of the misrepresentations which induced her to execute the property settlement agreement in the first instance, with further allegations that she did not discover the fraud which she alleged had been practiced upon her until June, 1933; and that her failure to make such discovery sooner was due to no negligence on her part. Those ratification agreements and the collection of the monthly installments paid to Mrs. Burguieres by defendant Farrell in accordance with the requirements of the judgment and other transactions by plaintiff, hereinafter noted, were all pleaded by defendant as constituting estoppels.

At the conclusion of the evidence, the court instructed the jury to return a verdict in favor of the defendants, which was done, and from the judgment rendered in accordance with that verdict plaintiff has prosecuted this appeal; and complaint of that ruling of the court is the principal assignment of error presented here.

According to the well-established rule in this state, in order to sustain that action by the trial judge, all material evidence relied on by the plaintiff must be accepted as true, to the exclusion of all evidence of a contrary effect, and the court must then be able to say that even though such evidence be given full faith and credit, it fails to make out a prima facie case in favor of the plaintiff. Stevens v. Karr, 119 Tex. 479, 33 S.W.(2d) 725.

It is also a well-settled rule that admissions against interest made by a party to a suit while testifying as a witness in the trial of the case are conclusive and binding upon him. 17 Tex. Jur. p. 577, and authorities there cited.

The following testimony given by plaintiff on the trial of the case is the only testimony cited in appellant's brief to support her allegation of fraudulent misrepresentations on the part of defendant Farrell which induced her to execute the property settlement agreement referred to above:

"A. Mr. Farrell brought Mr. Zweifel into the room. They made all the arrangements for the divorce, for the settlement, and everything that was arranged for, they took care of it. At one time I asked Mr. Farrell for my attorney. I said 'You have brought Mr. Zweifel in here. Can't I have an attorney?' He informed me that he wasn't going to separate the property.

"Q. Wasn't going to do what? A. Wasn't going to separate the property. And that if I called a bunch of attorneys in there, by the time they got through with it, there wouldn't be anything left for anybody. * * *

"A. Mr. Farrell said that an equal, or a fair amount to give me would be $500 a month.

"Q. For how long? A. Until I should remarry. But, due to his generosity and his fairness, he was going to make it $750 a month. He told me that there were lawsuits and debts against the property; that after they were settled, there would be practically nothing left. He told me I could take what he would give me, or I could take nothing. And it is hard to remember just exactly what he said, or what was said.

"Q. Was anything said about the nature and extent of the properties? A. Nothing, no.

"Q. Now, was there anything said about the Yount-Lee oil payment? A. Nothing was said about that, no. * * *

"A. There was only one particular piece that I remember, that was really mentioned

at that time, and that was the Gregg County.

"Q. What was said about the Gregg County? A. Well, that was the largest holdings, I think, and Mr. Farrell mentioned and told me that after the debts and lawsuits were filed, and, I mean, settled, there would be practically nothing left, and very little left of the Gregg County. Now, at that time that is the only particular property that he mentioned, that I remember he mentioned at all."

It thus appears that the only representation by defendant Farrell to plaintiff which she alleged induced her to execute the settlement agreement and—as alleged in her pleadings—other instruments ratifying it was to the effect that there were then outstanding debts and litigation against the community estate which probably would lessen its value and by reason of which his contract to pay her $750 per month for the remainder of her life would be of greater value to her than her half of the community estate at that time. It was proven by uncontradicted testimony of several disinterested witnesses that at that time many suits had been instituted against Farrell and his associates to recover title to 760.6 acres of the leases conveyed to the Yount-Lee Company, and which were then pending. The property conveyed to that company was described as 2,679.36 acres, but when surveyed out proved to be only 2,559.3 acres, a shortage of 120.6 that had already been lost by the grantors, and the evidence showed that the Yount-Lee Company had not then had its attorney to examine abstracts of title covering 548.83 acres. So then, the representation made to plaintiff by Farrell that such claims and litigation were then outstanding was true, thus leaving the representation as to the probable outcome of such claims and litigation the only question in dispute.

Authorities are cited by appellee to support the contention that such a representation would not furnish a basis for rescission of the settlement agreement in the first instance, since, manifestly, the same was a mere opinion, speculative in character, and must necessarily have been so understood by plaintiff at the time; such as Putman v. Bromwell, 73 Tex. 465, 11 S. W. 491; Schilder v. Fort Worth National Company (Tex. Civ. App.) 81 S.W.(2d) 247 (writ refused), and authorities there cited.

But appellant has cited Ralls v. Ralls (Tex. Civ. App.) 256 S. W. 688; McMurray v. McMurray, 67 Tex. 665, 4 S. W. 357; Kuehn v. Kuehn (Tex. Civ. App.) 232 S. W. 918, to support the contention that in view of the fiduciary relations then existing between the husband and wife, she had the right in equity to rely on that representation as a statement of fact, even though it involved an opinion only as to the outcome of future events. See, also, on this point, 7 Tex. Jur. § 18, page 980. In reply to that contention appellee argues that any former fiduciary relations between the parties were terminated by the action then taken by appellant to sue for a divorce and for a division of the community property, and by reason of the acts of the defendant which plaintiff testified caused her to cease to be on speaking terms with him before she brought the suit.

We do not believe a determination of that question important here, in view of our conclusions hereinafter stated.

Plaintiff testified that immediately after the decree of divorce was entered, she left Fort Worth for New Orleans, and on the fourth day after departure she married her present husband, Albert L. Burguieres. The record shows that on the last day for the filing of a motion for new trial in the divorce case, the defendant filed such a motion, one of the grounds for which was, in substance, that plaintiff had procured the divorce for the purpose of marrying another man with whom she had been keeping company. At that time the defendant did not know that she had already married. As soon as plaintiff learned of that motion for new trial, she immediately returned to Fort Worth, where defendant met her at her request, and in that meeting she endeavored to dissuade him from prosecuting the motion and promised that if he would withdraw it and leave her alone for six months, she would return to Fort Worth and remarry him; telling the defendant at the same time that she had not then married. Thereafter, the defendant abandoned his motion for new trial and the same was overruled by operation of law.

After the judgment of divorce, the defendant failed for a few months to make the payments of $750 per month, stipulated in the judgment, and the same were furnished by the trustee bank holding the collateral that had been deposited to se-

cure the same. Upon plaintiff's complaint of such failure, the defendant, through his attorney, had a conference with her in Dallas and in accordance with an agreement then entered into, defendant repaid to the trustee bank the amount of advancements that had theretofore been made by it, leaving the collateral security held by the bank intact as security for all future installments, and that arrangement was accepted by the plaintiff as satisfactory. The facts just related were relied upon by the defendant as a further ratification of the property settlement and the judgment of the court in accordance therewith.

Plaintiff further testified to the following facts:

During the time she and defendant had lived together, he had engaged in the oil business in several different places and she was thoroughly informed of all of his activities with an intimate knowledge of the leases he acquired and their operation; and the lease which was sold to the Yount-Lee Oil Company was purchased by defendant and his associates with her knowledge and her express approval. Defendant had failed in business three times, and the lease sold to the Yount-Lee Oil Company and defendant's interest in that sale represented practically everything of value defendant owned when the divorce suit was instituted. After defendant and his associates had acquired that lease, the Arkansas Fuel Oil Company entered into a contract to buy it for a consideration of $3,500,000, but that contract was never consummated. Prior to the execution of the settlement agreement between her and the defendant, the defendant told her that he and his associates had entered into a contract to sell the lease to the Yount-Lee Oil Company and that he would get one-half of the proceeds of the sale for his interest. During their marriage plaintiff and defendant had frequent quarrels, during which the subject of divorce had been discussed, and for four days preceding institution of the divorce suit they had not been on speaking terms. In answer to an inquiry over the telephone by defendant if she still wanted a divorce, she met him and Mr. Zweifel, whom the defendant then employed as her attorney, and with her consent to institute for her the suit for divorce and for the recovery of her one-half interest in the community estate, and defendant thereafter paid Mr. Zweifel

$7,500 for his services in that suit. When Mr. Zweifel was employed and at a conference between him and plaintiff and defendant relative to a settlement of property rights, and before the settlement agreement was executed, defendant first proposed the payment to her of $500 per month during her widowhood in full settlement of her property rights. Mr. Zweifel countered with the proposal that defendant pay plaintiff $750 per month during her life, with collateral security in the way of a $40,000 trust fund to be deposited with some trustee bank. The defendant and plaintiff both assented to that suggestion and the settlement agreement was then drawn up by Mr. Zweifel and executed by both parties. Mr. Zweifel filed the suit for divorce for and in behalf of plaintiff and for a settlement of her property rights in the community estate in accordance with the written agreement already executed, and the petition included a prayer for the issuance of a temporary writ of injunction to restrain the defendant from disposing of any of the community property during the pendency of the suit. Thereafter Mr. Zweifel continued to act as her attorney and appeared for her when the divorce case was tried in defendant's absence, and, by advice and counsel, aided her in procuring the judgment that was rendered. Later Mr. Zweifel was employed by her as her attorney to advise her relative to the subsequent ratification agreements which were fully explained to her by him before she executed them, and he dealt fairly with her in all matters concerning which he had advised her, and before the divorce suit was tried he explained to her that she was entitled to a half interest in the community property and also her homestead rights in the home which she quitclaimed to defendant after the divorce decree. The evidence showed plaintiff then had a life expectancy of at least forty years.

Hon. Hal S. Lattimore, the trial judge who tried the divorce case, testified as a witness in this case that after hearing plaintiff's testimony which she reluctantly gave in support of her alleged grounds for a divorce, he then said to plaintiff: "I understand you have made a property settlement." To which plaintiff replied: "Yes." He then said to plaintiff: "I think you are both making a mistake, to make such an agreement as that. It is

going to make you both unhappy, and I think you ought to just divide your property so you won't have any occasion to communicate with each other any more; but if that is. * * *" To which the witness replied: "Well, that is the way I want it." The court then said: "Well, if that is the way you want it, and you are satisfied with it, I will approve it."

That testimony was not denied by plaintiff while on the witness stand, and she virtually admitted it to be true.

The evidence showed that Ligon & Co., professional accountants, prepared monthly audits of defendant's assets and accounts, and plaintiff testified that in June, 1933, she received a letter from that firm showing the income tax chargeable to her by reason of her interest in the Yount-Lee deal, and that by reason of that information she became dissatisfied with the property settlement theretofore made with defendant and at once called Mr. Zweifel over the telephone to come to New Orleans, where, after consultation with him, she instructed him to institute this suit and verified the original petition prepared by Mr. Zweifel.

Mrs. Grace (Owens) McEntire, defendant's secretary, testified that defendant had on file in his office copies of the Yount-Lee contract and of the financial statements prepared by Ligon & Co., all of which she would have gladly shown plaintiff at any time, and according to the testimony of defendant, which was fully corroborated by C. F. Corzelius, a disinterested witness, during the pendency of the divorce suit Mr. Zweifel came to defendant's office, and in response to his inquiry therefor, he was furnished with a copy of the Yount-Lee contract and also a copy of an audit by Ligon & Co., showing a full statement of all Farrell's assets and accounts, which he (Zweifel) took with him, expressing his desire to be fully informed as to plaintiff's property rights before trial of the divorce suit. And since no testimony was introduced from any source to contradict that testimony and no excuse offered by plaintiff for failure to introduce Mr. Zweifel, who had theretofore withdrawn from the case, to refute that testimony, the trial court was authorized to accept it as true and to find that plaintiff was bound by the knowledge so acquired by her former attorney, Mr. Zweifel. Hexter v. Pratt (Tex. Com. App.) 10 S.W.(2d) 692;

Fordtran v. Cunningham (Tex. Civ. App.) 141 S. W. 562; Newton v. Easterwood (Tex. Civ. App.) 154 S. W. 646.

Appellant cites several decisions reversing decrees in divorce cases, divesting one of the spouses of title to real estate—all because such action was expressly prohibited by article 4638 of our Revised Civil Statutes. Among cases cited are: Reasonover v. Reasonover (Tex. Civ. App.) 59 S.W.(2d) 887; Aucutt v. Aucutt (Tex. Civ. App.) 63 S.W.(2d) 755; Phillips v. Phillips (Tex. Civ. App.) 203 S. W. 77; Cunningham v. Cunningham, 120 Tex. 491, 40 S.W.(2d) 46, 75 A. L. R. 1305.

But as indicated by the very terms of that statute, the same is not applicable to a judgment of that character when the same is consented to by the spouse against whom it is rendered. It is plain, therefore, that those authorities have no application here, since the judgment rendered divesting plaintiff of her interest in the community estate was with her express consent in writing for a valuable consideration and thereafter expressly ratified.

We quote the following from the opinion of Justice Critz—then on the Commission of Appeals, now Justice of the Supreme Court—in Smith v. Ferrell, 44 S.W.(2d) 962, 966:

"It has been well said that in ordinary cases the trial judge has a certain amount of discretion in granting new trials during the term. However, no such discretion can be exercised after the expiration of the term. The judgment then becomes a vested right which can only be divested by a direct proceeding filed for that purpose, and, when such a proceeding is resorted to, the person presenting the bill must bring himself strictly within the rules of law providing for relief in such cases. It is not enough that he plead and prove that he had a meritorious defense in the first instance, but he must go further and show that he was then free from negligence. In such case he is charged, as a matter of law, not only with what he knew during the term, but what he might have known had he used reasonable diligence. Goss v. McClaren, supra [17 Tex. 107, 67 Am. Dec. 646]. * * *

"We are always reluctant to reverse a case on the facts, but the security of government depends on the sanctity of judg-

ments, and their enforcement according to the well-established rules of law."

The rule there stated is universal and has been announced in numerous cases that might be cited, such as McCauley v. Northern Texas Traction Co. (Tex. Civ. App.) 21 S.W.(2d) 309; Johnson v. Templeton, 60 Tex. 238. We quote further from 25 Tex. Jur. p. 389: "Just as any other judgment, a consent judgment is conclusive as to the matters adjudicated, and is not subject to collateral attack except on jurisdictional grounds. 'A final judgment on the merits is just as conclusive on the merits if entered by consent as if rendered after contest.'"

And also from page 391: "The fact that a party consented to a judgment does not, in some circumstances, prevent him from having it vacated or set aside. But when a party seeks in equity to set aside a judgment rendered by consent against him in a court of law, it should appear, as is ordinarily the rule, that it would be against conscience to permit the judgment to be executed and that the injured party has been prevented by fraud or accident, unmixed with any fault or negligence in himself or his agent, from making the proper defense." See, also, Hartford Fire Ins. Co. v. King, 31 Tex. Civ. App. 636, 73 S. W. 71; Gulf Production Co. v. Palmer (Tex. Civ. App.) 230 S. W. 1017; Williams v. Nolan, 58 Tex. 708.

And that rule was followed in suits by wives to set aside judgments rendered in divorce cases.

In briefs for appellant counsel have not pointed out any testimony by her that by reason of the alleged misrepresentations of the defendant she was induced to execute either the original settlement agreement or any of the subsequent ratification instruments and to take no steps to set aside the judgment until June, 1933, approximately a year and ten months after the date of the judgment. 20 Tex. Jur. § 29, p. 51.

Nor did she introduce any testimony to show that by the exercise of ordinary diligence she could not have discovered the falsity of the representations so made by the defendant during that time.

It is a familiar rule that in a suit founded on fraud and deceit, the wrongdoer will not be heard to say in his defense that plaintiff "might have known the truth by proper inquiry." Labbe v. Corbett, 69 Tex. 503, 6 S.W. 808, 811; Buchanan v.

Burnett, 102 Tex. 492, 119 S. W. 1141, 132 Am. St. Rep. 900.

But in a suit in equity to set aside a judgment based on a written agreement of the parties, plaintiff has the burden not only to show valid reasons for setting aside that contract and thereby establishing a meritorious defense to the judgment rendered, but he must go further and show that his failure to urge that defense at the trial or by motion for new trial, or by appeal if the same was there available, was due to no negligence on his part. See authorities, supra.

Even though the question whether or not the settlement agreement between plaintiff and her former husband represented a fair division of the community estate might have been an issue for determination by the jury, yet, since the facts cited above conclusively showed a failure by plaintiff to establish other necessary grounds for setting aside the judgment, the trial court did not err in instructing a verdict for the defendant. In addition to authorities cited above, see, also, Smith v. Ferrell (Tex. Com. App.) 44 S. W.(2d) 962; Snow v. Cook (Tex. Civ. App.) 278 S. W. 520 (writ dismissed); Saunders v. Saunders (Tex. Civ. App.) 293 S. W. 899; Wagley v. Wagley (Tex. Civ. App.) 230 S. W. 493; Sperry v. Sperry (Tex. Civ. App.) 103 S. W. 419; Harn v. Phelps, 65 Tex. 592, and authorities cited in that opinion; Moore v. Moore (Tex. Civ. App.) 259 S. W. 322. The following decisions, among others relied upon by appellant in support of her appeal, we believe are distinguishable from the present suit on the facts. Rains v. Wheeler, 76 Tex. 390, 13 S. W. 324, involved a contract made between a husband and wife during their separation, but which agreement was never carried into a judgment. The same was true of settlement agreements involved in Kuehn v. Kuehn (Tex. Civ. App.) 232 S. W. 918, Link v. Link (Tex. Civ. App.) 63 S.W.(2d) 1045, and Cox v. Mailander (Tex. Civ. App.) 178 S. W. 1012.

In Ralls v. Ralls (Tex. Civ. App.) 256 S. W. 688, 695, most strongly stressed, Mrs. Ralls, plaintiff, sought to set aside a decree settling her property rights in the community estate of herself and husband which was entered as a part of the judgment granting her a divorce. The judgment was based upon a written agreement of the parties to the divorce suit, and at

the conclusion of the evidence the trial court instructed a verdict against plaintiff. In the opinion the agreement upon which the judgment was rendered is set out, together with the testimony of the facts leading up to its execution by Mrs. Ralls. In that case the opinion of Judge Stayton in McMurray v. McMurray, 67 Tex. 665, 4 S. W. 357, was cited, and in which it was held that a wife would have the right to set aside a decree of court entered in a divorce proceeding which did not award her a fair division of the community estate, upon allegations and proof of a fraudulent concealment by the husband of its extent and value followed by perjured testimony given by him on the trial of the case, if the wife was ignorant of the true facts during the trial and was prevented by fraud from presenting her defense at the time of the trial. Following a reference to what was said by Judge Stayton in that case, Judge Boyce, in the Ralls Case, used this language: "So in this case, the fraud, if there was any, prevented the wife from having a real trial of her rights. The agreement itself contemplated a mock trial, and the use of the judgment of the court to consummate the fraud. The fraud was upon the court as well as the wife."

The testimony recited in the case amply supported that conclusion, and clearly distinguishes that decision from the suit at bar.

It would be an unnecessary and fruitless undertaking to discuss the facts involved in numerous other decisions cited by the appellant, since we are convinced that all of them recognized the general principles announced in the authorities above quoted as to what is necessary to be proven in a suit in equity to set aside a judgment rendered at a former term of court, but that the facts developed in those cases were sufficient to meet that test.

Error is assigned to the refusal of the court to permit the introduction of the community income tax return filed by the defendant Farrell, purporting to show plaintiff's interest in the community property to be $304,951, net worth of her one-half interest in the community estate as of date July 31, 1931, and the present worth of the annuity received by her as the result of the divorce judgment to be $187,805—a loss of $117,146. That evidence was offered on the theory of admission by the defendant against interest. Complaint is also made of the refusal of the court to allow counsel for appellant to cross-examine witnesses who had testified to various lawsuits pending as to what was the final outcome of those suits, and also as to what certain properties were actually sold for at a later date.

Those assignments are overruled since the facts excluded would have no material bearing upon the conclusions we have reached as shown above.

And we deem it proper to add that the record here includes a statement of facts in nine volumes covering more than 3,200 pages, making it impossible to do more than note the facts which are of controlling effect in the disposition of this appeal and which were conclusively established on the trial of the case.

Accordingly, the judgment of the trial court is affirmed, Mr. Justice LATTIMORE and Mr. Justice BROWN concurring per their separate opinions filed.

BROWN, Justice (concurring).

Appellant brought a suit in equity against the Yount-Lee Oil Company and John E. Farrell to set aside a solemn judgment of a court of competent jurisdiction, which judgment she had procured of her own volition, and which she and her present husband expressly ratified by several instruments in writing, and which judgment she, through concealment and deceit, prevented appellee from attempting, by a motion for a new trial, timely filed, to set aside.

It is interesting to note that in her divorce action, with the exception of the prayer for a dissolution of the marriage contract, appellant prayed for the same relief, as to the disposition of the community estate, which she prays for in her bill of review.

Rights, with respect to bills of review, have been established by courts of equity for and in behalf of defendants in judgment, but these rights have been extended to plaintiffs in judgment, under proper allegations, supported by competent evidence.

If it be true, that a defendant in judgment is bound by strict and exacting rules, governing his pleadings and proof, under which he must bring himself, before relief will be granted, it follows that a plaintiff in judgment must be no less bound.

This writer is of the opinion that, where a plaintiff in judgment, who has voluntarily invoked the jurisdiction of a court having authority to render judgment for him, and who insists upon the judgment that was rendered, and who, by deceitful promises and concealment of material facts, prevents the defendant in judgment from pressing a motion for a rehearing, timely filed, until the defendant's right to a hearing on such motion is lost—the concealment being of a new status and newly acquired right which would be destroyed and lost, by the granting of a new trial—and who has expressly ratified the judgment he procured by instruments in writing and voluntary acts, such a plaintiff in judgment should be held to a stricter showing of the right to set aside any part of the judgment procured by him than is required of defendants in judgment, or plaintiffs in judgment, where no such facts are conclusively established.

But applying only the ordinary rules governing bills of review to the case at bar, appellant does not show that she is entitled to the relief she seeks.

Let us review the uncontradicted evidence introduced before the trial court, and the record before us, as made.

In her petition for a divorce and for a division of the community estate, she expressly alleged that because of the cruel and inhuman treatment visited upon her by appellee (the defendant) she was compelled to abandon him on March 1, 1931, four months and seven days before she filed her suit; and she expressly prayed that the trial court order appellee to file an inventory and appraisement of the community estate, and for a division thereof, on a final hearing.

In her original bill of review, to which she personally made oath, filed by her on July 5, 1933, she expressly alleged that she and appellee lived together as husband and wife until March 1, 1931; while in her amended pleading on which she went to trial she alleged that the marriage relation continued from the date of the marriage until July 7, 1931. This pleading was sworn to by one of her attorneys. We are warranted in concluding that her testimony, on the hearing of her divorce suit, established the fact that the intimate relation of husband and wife never existed, after March 1, 1931. That was a very material allegation in her petition, and the court found in the judgment that all of her material allegations had been established.

In her original bill of review, signed and sworn to by her, in an attempt to show diligence, she avers that she "did not actually learn of the true situation until she had occasion to return to Texas during the early part of the year 1933."

In her amended petition, verified by her counsel, she avers that she and appellee lived together as husband and wife until July 7, 1931, and that "she remained unaware of the frauds which had been practiced upon her and of the frauds which were continuing to be practiced upon her until June of 1933."

In her original bill of review she avers that appellee was a man of wide business experience, while she was inexperienced in business matters, and that she was not on a fair level with him when she made the settlement agreement she now seeks to cancel. She also avers that appellee "had previously represented and did at the time represent to the plaintiff that said community estate consisted principally of choses in action of uncertain and speculative value, and that the income therefrom would not exceed the sum of twenty or twenty-five thousands of dollars per year; that it was probable that only a small part of the amount which was payable out of oil under the terms of the contract with the defendant Yount-Lee Oil Company, as aforesaid, would actually be recoverable and paid; and also represented that their community estate was heavily indebted, and that practically all of the cash realized from the sale to the defendant Yount-Lee Oil Company had been applied and would have to be applied to such indebtedness, and that even the sum of $500.00 per month would be a fair and adequate compensation to her for her half interest in the community estate, and that it was only through the generosity and desire to deal fairly and equitably with her that said Farrell would agree to pay her the sum of $750.00 per month."

She further averred that "she was induced by his persuasive arguments to the effect that he was and would always deal with her fairly and see that she received the equal of one-half of the community estate, to enter into the agreement."

She averred that she relied on the matters alleged and executed the contract under such circumstances. She introduced in evidence her original petition which was

verified by her and for which she stands sponsor.

She alleged in her amended petition that because of her grief for her little son, who was accidently killed, she was mentally distracted and incapable of appreciating the value of the community estate, or what would amount to a fair division thereof, and that appellee procured her to enter into the settlement contract while she was in such condition.

She alleged that appellee inquired of her, on the morning of July 7, 1931, whether she wished a divorce, and without waiting for her reply took steps to employ Henry Zweifel, a practicing attorney of Fort Worth, to attend to the matter of procuring the divorce and preparing all necessary papers and documents in connection therewith; that she knew Zweifel only by sight, and that appellee brought him to the home on the morning of July 8, 1931, and that appellee proceeded to state to her that Zweifel would attend to the divorce proceedings and prepare all necessary agreements between them; that at such time appellee was her husband and partner in the community and owed her the duty to deal fairly with her and to make known to her all pertinent facts concerning the extent and value of the community estate, and that she believed and trusted in her said husband.

Her allegations, which she contends amount to fraudulent misrepresentations, are: "(a) That the $1,000,000.00 oil payment provided for under terms of the Yount-Lee Oil Company contract would finally yield a small revenue, and also that said $1,000,000.00 oil payment was so incumbered by litigation that there would be little or nothing left of same. (b) That the community estate of the plaintiff and himself was heavily indebted and that practically all of the cash realized from the Yount-Lee sale had been applied and would have to be applied on the community indebtedness. (c) That the sum of even $500.00 per month would be a fair, equal and adequate compensation to her for her one-half interest in the community estate. (d) That unless the plaintiff took what he offered her and what he was willing to give her, she would receive nothing at all."

She further alleged that appellee concealed from her the facts concerning the value and extent of the community estate, and of their net income for the year 1931. She alleged that the settlement made by her is inequitable and unjust, in that it did not and does not purport to give her the equal one-half interest in the community estate to which she is entitled; and that the obligation upon the part of appellee to pay her $750 per month, so long as she lives, is speculative and uncertain and depends on the continued solvency of appellee, and his willingness to pay same, except as to the $40,000 trust or guarantee fund which was placed with the bank to guarantee faithful performance by appellee.

She alleged that she had ratified the settlement agreement and the judgment she had obtained by a number of instruments in writing, but alleged that she did not know the true facts concerning the value and extent of the community estate, when she executed such instruments. She prayed for a cancellation of the judgment she obtained in the district court, in so far as it deals with her property rights, and a cancellation of the settlement agreement and of all instruments executed by her under the contract and judgment and in ratification thereof.

Having made Yount-Lee Oil Company a party defendant, she prays for judgment against appellee and said oil company for "an undivided one-half interest in and to that certain $1,000,000.00 oil payment, which is an interest in the land described in the conveyance which created same * * * that plaintiff recover judgment as against both defendants, canceling and declaring null and void that certain settlement agreement of July 8, 1931, and all subsequent contracts, including the release and quit-claim executed in favor of the defendant Farrell and Yount-Lee Oil Company, in connection with the oil payment. Plaintiff further prays that the judgment of the court entered in cause No. 91,070 be vacated and set aside in so far as it makes any orders with reference to the community estate of the plaintiff and the defendant Farrell, and in so far as it deals with said community estate and disposes of same, and that judgment herein be entered providing for an equitable participation (partition?) of the community estate between the plaintiff and the defendant Farrell. * * * Plaintiff further prays that she recover of both defendants an equal one-half part of the $1,000,000.00 oil payment which the defendant Yount-Lee

Oil Company has agreed to pay." She made other allegations in the amended petition not necessary to be noticed.

Appellee answered denying appellant's averments, and alleged definite knowledge upon appellant's part of all the deals and transactions had during their married life; that early in March, 1931, following the death of their little son, appellant began, as she had done in the past, to threaten to leave him and to vex and annoy and mistreat him for the purpose of making his life so unhappy and unpleasant as to induce him not to resist her efforts to obtain a divorce, although he had been guilty of no conduct giving rise to her desire for a divorce; that on the morning of July 7, 1931, appellant announced to him that she had definitely determined to seek a divorce; that, seeing she was determined to leave him, he obtained Henry Zweifel to act as attorney for her, and that she and her attorney, being fully advised in the premises, made the contract of settlement of which she complains, filed suit for the divorce, secured a waiver of service of process from appellee, and on August 8, 1931, thirty days after filing such suit, appellant obtained the judgment awarding her a divorce and settling her property rights in accordance with the contract and agreement; that during the times mentioned appellant and her attorney Zweifel had a copy of the Yount-Lee Oil Company contract, which is dated March 11, 1931. That immediately upon filing her suit for divorce appellant left Fort Worth and went to the city of New Orleans, and there associated with her present husband, which fact she kept secret from appellee, and that prior to the day on which she obtained her divorce decree, she had agreed to marry her present husband, and did in fact marry him four days after the decree was obtained by her on August 8, 1931; that appellee learned she was associating intimately with some man in New Orleans, and on August 18, 1931, appellee filed a motion to set aside the divorce decree and judgment theretofore obtained by appellant; whereupon appellant returned to Fort Worth, sought to induce appellee to withdraw his motion for a new trial, denied she was associating with any other man, promised to come back to appellee at the end of six months and remarry him, although at such time she was secretly married to her present husband; that appellee withdrew his motion for a new trial,

because of her statements and promises, and permitted the divorce decree to become final. That in October, 1931, Yount-Lee Oil Company demanded of appellee that he obtain a release and ratification from appellant and her present husband; that they executed and delivered such instrument, which set forth all the terms of the sale by appellee and his associates to said oil company, in November, 1931; that likewise a quitclaim deed to the homestead property was executed by them in February, 1932; that appellant has fully ratified the contract and settlement agreement made by her, and the judgment obtained by her; that if she was not possessed of full knowledge of the facts concerning the extent and value of the community estate, she and her attorney were guilty of negligence in failing to secure the facts as they could have done; that when the settlement was entered into his business was of such a speculative, uncertain nature as to render its value incapable of definite ascertainment; and appellant elected and chose to settle her rights on the basis of $750 per month to be paid to her so long as she lives.

Appellee pleaded laches, waiver, ratification, and estoppel.

Appellant answering appellee's pleading, averred that appellee "in the handling of his properties was always reticent and seclusive, giving plaintiff little or no information concerning same"; that every effort on her part to learn the truth concerning their properties has been met by the appellee with design and well-studied attempts to cover up and hide same from appellant; that she is still ignorant of the nature and extent of the properties, and after diligent effort and search upon her part, she has incomplete and uncertain information as to the nature and extent of the same.

She alleged that "prior to the morning of July 7, 1931, in question, this plaintiff would show that she and the defendant had gone for weeks at a time without speaking to each other, and on July 7, 1931, the defendant asked the plaintiff if she was going to 'get that divorce' and upon her failure to reply, the defendant left the house and shortly thereafter called the plaintiff over the telephone and told her that he had procured the services of one Henry Zweifel to obtain the divorce"; that she had made no request for an at-

torney; that Zweifel was not her representative, but was appellee's; and that appellee selected the attorney and paid him a large fee.. She further alleged that she learned of the facts concerning the value of the community estate on June 8, 1933, and signed the original petition in this cause on June 10th thereafter; she alleged that appellee "worshipped the almighty dollar" and was exacting and quarrelsome concerning what she spent, and furnished her only small sums with which to purchase necessaries; that appellee sought to make her life miserable for the purpose of forcing a separation; that appellee frequently asked her to get her divorce, but she ignored his requests and upon his insistence she agreed to do so; and that "after she was so kicked out she had no place to go."

At no time did appellant allege that she ever had any love for appellee, but alleged that appellee had no love for her.

In her original bill of review, appellant specifically prayed for judgment against appellee Yount-Lee Oil Company for her one-half of the $1,000,000 oil payment contracted to be paid under its purchase from Farrell and associates. asserting that she had demanded of such appellee payment and it had refused her demands, and prayed that the instrument, executed by her, releasing said appellee from liability as to such payment be canceled and held for naught.

In her amended petition she seeks the same relief, but in broader terms, by simply praying "that she recover of both defendants an equal one-half part of the $1,000,000.00 oil payment which the defendant Yount-Lee Oil Company has agreed to pay," and canceling the release she executed to both appellees.

Appellant has evidently searched the record of more than 3,250 pages to find the evidence and testimony introduced that is most favorable to her and which she asserts tends to support her allegation of fraud and overreaching. The following appears in her brief:

"Q. Now, Mrs. Burguieres, tell this jury now in your own way, just turn and talk to those gentlemen so these on the end back here can hear what you have to say about what was said by John Farrell about what he had and what you had. A. Mr. Farrell said that an equal, or a fair amount to give me would be $500.00 per month.

"Q. For how long? A. Until I should remarry. But due to his generosity and his fairness he was going to make it $750.00 a month. He told me that there were lawsuits and debts against the property; that after they were settled, there would be practically nothing left. He told me I could take what he would give me, or I could take nothing. And it is hard to remember just exactly what he said, or what was said."

She testified that nothing was said about the nature or extent of the properties; nothing was said about the Yount-Lee Oil payments; that no particular lawsuits were mentioned; that she knew of one for $200,000 about which appellee had told her; that she knew appellee had sold the East Texas properties to Yount-Lee Oil Company for $3,000,000 and that she knew appellee owned one-half of the purchase price, and that the sale was made March 11, 1931; that she was in California when the sale was made and she did not know what appellee had been doing with his properties while she was there, except she knew he had bought some stocks.

Having already testified to the occasion and circumstances that arose just prior to the filing of her divorce suit, she had said that on the morning of July 7, 1931, she came down to breakfast and as she sat down to the table appellee asked her if she had made up her mind about a divorce; that she did not answer him but got up and went upstairs; that he called her over the telephone later and said: "Have you made up your mind about that divorce? If you have, I am in Henry Zweifel's office"; that she did not answer, but "hung up"; that in a few minutes she called him and said: "If you want the divorce, then it is all right with me"; that in a few minutes appellee and Zweifel came out. As an explanation of why she called back, she said: "Well, of all of the times he had asked me that, and of all the times he told me I could have a divorce, and that I could leave, if he wanted me to leave, and then, then—well, it was impossible to go any further. Well, he was just as unhappy as I was. He asked me again, and I said 'Yes'. That's all." She said she did not know Zweifel, but had heard of him.

In further detailing what was said and done when she, appellee, and Zweifel were discussing the divorce suit, she said: "During the time we were discussing this

settlement, why, Mr. Zweifel and Mr. Farrell were in the room; I asked for a trust fund to guarantee this $750.00 a month.

"Q. Now, just a minute right there. Tell this jury whether or not Mr. Zweifel asked for that, or did you do it? A. I believe I asked for it.

"Q. All right, what was said when you asked for it? A. Mr. Zweifel asked me about how much—I said 'well, $25,000.00'. Mr. Zweifel said: 'That is not enough. Let's make it fifty'. Mr. Farrell said he could not do it, he couldn't make it fifty. Then there was some argument about that and it was finally settled on $40,000.00. Mr. Zweifel asked if he would put up $40,000.00 cash. He said 'no', he didn't have $40,000.00 cash; that he would put up $20,000.00 cash and the balance in Steel." Further she was asked:

"Q. Now, then, do you remember anything else that was said at the time, when you were trying to settle the property rights, do you remember anything more? A. Well, there was quite an argument up, although I agreed to it.

"Q. About what? A. About how long this $750.00 a month would be. Mr. Farrell said until I remarried; and Mr. Zweifel said no, that was not right, that it should be as long as I lived. I told Mr. Farrell I was willing to accept the $750.00 until I remarried. It was finally agreed that I should get it as long as I lived."

She then testified that there was a discussion about the automobiles and she asked for the $12,000 Cadillac and appellee gave it to her. She testified that nothing was said about her getting a lawyer to look at the papers. She had previously testified that during the conference with appellee and Zweifel "at one time I asked Mr. Farrell for my attorney. I said: 'You have brought Mr. Zweifel in here. Can't I have an attorney?' He informed me that he wasn't going to separate the property. And that if I called a bunch of attorneys in there, by the time they got through with it, there wouldn't be anything left for anybody." She testified that she made no further statement or effort to get a lawyer, and testified that she told appellee she preferred that he get the divorce, but Zweifel said he would not handle it that way; that there might come a time when she would be sorry; and that he would not take the case unless she obtained the divorce.

It will be observed that appellant nowhere alleges that she demanded or desired an attorney of her selection to represent her, and that she was refused such request; and nowhere alleges that she declined to accept the services of Zweifel; and nowhere alleges that Zweifel misled her, concealed anything from her, dealt unfairly with her, or colluded with appellee to defraud her. It is undisputed that she accepted Zweifel's services and continued to deal with him as her attorney even unto the filing of her original petition in this cause, and it is nowhere alleged or hinted that she procured or was a party to his withdrawal from the case.

In detailing what testimony was not introduced before the trial court in connection with the value of the community estate, the following appears:

"Q. Were any witnesses heard concerning the value of the community estate between yourself and your husband? A. None at all, other than what Mr. Zweifel heard."

In an effort to show no want of diligence on her part to learn the true facts about the value of her portion of the community estate, she testified that she received, in New Orleans, a letter from Fort Worth, dated June 7, 1933, which she testifies she must have received on June 8th; that this letter gave her information concerning the income she and appellee had, or must have had for the year 1931, up to the 31st day of July of such year; that she examined the contents of the letter and immediately made arrangements to file suit against appellee; that she called Zweifel, who came to New Orleans the following day and brought with him the papers already prepared for her signature; that he arrived at about 7 o'clock and wanted to return on the 1 o'clock train; that she and Zweifel tried to find a notary but failed; that she told him to go on, and she would get the papers "notarized" that afternoon, and get it off on the night train; and that she did so. She said the paper she referred to was her original petition filed in this cause.

Further in her direct testimony, being asked by her counsel whether or not any specific character or kinds of property were discussed by appellee just prior to the filing of the divorce suit, she said:

"A. There was only one particular piece that I remember, that was really mentioned at that time, and that was the Gregg county.

"Q. What was said about the Gregg county? A. Well, that was the largest holding, I think, and Mr. Farrell mentioned and told me that after the debts and lawsuits were filed, and I mean, settled, there would be practically nothing left, and a very little left of the Gregg county."

The "Gregg county" to which appellant referred were the oil lands sold to Yount-Lee Oil Company.

Appellant testified specifically to the execution by her and by her present husband of all of the instruments in writing which specifically ratified the original contract made between her and appellee, and specifically ratified the judgment which she sought and obtained against appellee. She introduced in evidence the original separation contract and settlement, and all of the ratifying instruments as follows: A quitclaim deed executed by appellant on August 20, 1931, conveying to appellee all of her right, title, and interest in and to the former homestead. This instrument she executed under the name of Stella B. Farrell, and as a feme sole, and so acknowledged it, although at the time she was secretly married to her present husband. Her marriage being made known to appellee, she and her present husband executed and delivered to appellee a second quitclaim deed to the homestead on February 18, 1932, which she introduced in evidence.

On October 20, 1931, appellant was given an instrument for execution which described minutely the contract of the sale of the East Texas oil lands by appellee and his associates to Yount-Lee Oil Company. This instrument gives the date of such contract of sale; the consideration paid and to be paid; the amount of cash actually paid and the several amounts of cash and the times of all subsequent payments to be made; the amount to be paid out of the oil produced therefrom; the actual interest owned by appellee and that owned by his associates; and the volume and page of the deed records of Gregg county, Tex., where the instrument is recorded. The instrument so delivered to her recites that she was the wife of appellee when the contract of sale was made and that the properties conveyed were the community properties of appellant and appellee. It further recites in detail the filing of a suit by appellant for a divorce from appellee and a division of the community estate; the entering into

of a contract of settlement of the property rights between the parties, describing such settlement; the procuring of a judgment thereafter by her which embodied the terms of the settlement agreement which obligated her to transfer and assign all of her right, title, and interest in and to the community estate to appellee, and specifically conveys, releases, and quitclaims to appellee all of her rights in and to the Yount-Lee Oil Company contract and sale both as to all prior payments and all future payments thereunder; and said instrument expressly ratifies the settlement contract she made with appellee on July 8, 1931. She testified that this instrument was explained to her; that she executed it and acknowledged it on October 21, 1931, but that her present husband declined to execute it; and she further testified that she kept it in her possession and delivered it subsequently to her attorneys. She introduced it in evidence.

On November 2, 1931, appellant and her present husband executed and duly acknowledged a similar instrument reciting all of the facts in detail which are recited in the instrument dated October 20, 1931, and which instrument expressly released "said Yount-Lee Oil Company from any obligation to account to me for any amount due or to become due (whether payable in cash or out of the proceeds from oil) under the terms and provisions of the above assignment from the said John E. Farrell et al., to said Yount-Lee Oil Company." This instrument was introduced in evidence by appellant and is her Exhibit No. 15. She testified that the instruments she executed were explained to her by Zweifel. She said with reference to the instrument executed by her alone, and that executed by her and her husband:

"A. Both of the instruments were explained in the same manner. The one Mr. Johnson (counsel) now has, Mr. Zweifel explained it was just ratifying the first agreement and I signed it.

"Q. What do you mean by the first agreement? A. The agreement that was made at the time of the separation on the 7th day of July, or the 8th day of July. This agreement, Mr. Zweifel brought to me (exhibit 15), and explained the different things in it, and said it was (as I knew) an oil company that didn't want to pay out payments any more than they had to, and they objected to paying the

payments, unless everything was in order, and they refused to pay any more payments on the oil runs until that agreement had been signed."

On November 24, 1931, appellant and her present husband executed and delivered to appellee an instrument assigning and conveying to appellee all right, title, and interest in and to all of the royalty and mineral interest in some fourteen tracts of land described as to owners, surveys. and recorded instruments. She testified that it was executed and delivered without objection on her part.

Appellant introduced in evidence also the property settlement agreement; her original petition for a divorce and division of the community estate; the decree she obtained; her original petition in the instant suit; and a copy of the Yount-Lee Oil Company contract.

It is a wholesome rule, and should assuredly be applied in suits in equity, that the testimony given and admissions made by a party to a suit must be construed as binding upon him, and not merely sufficient to raise issues of fact. His testimony should be governed by rules that wholly differ from rules governing witnesses who are not parties. Nerio v. Christen et al., (Tex. Civ. App.) 189 S. W. 1038; Smith v. Boston Elevated Ry. Co. (C. C. A.) 184 F. 387, 37 L. R. A. (N. S.) 429, 431; Southern Surety Co. v. Inabnit (Tex. Civ. App.) 1 S.W.(2d) 412; 17 Tex. Jur. pp. 577, 578.

Appellant, by rather general statements, while on the witness stand, said she knew very little about the community properties, but, on cross-examination she testified positively that she knew just as much about the extent and value of the community properties on July 7, 1931, as she did when she executed the several instruments that expressly ratified the settlement agreement which she entered into with appellee, and the judgment which she sought and obtained. She testified that all of these ratifying instruments were explained to her. She admits that she kept one of them in her possession from October 20, 1931, until she prosecuted the instant suit. It gave her the minute details of the community estate under the Yount-Lee sale. With such an instrument in her hands on October 20, 1931, she subsequently joined her husband in executing and delivering a similar instrument on November 2, 1931, expressly releasing Yount-Lee Oil Company from all liability to her for payments made, or to be made, to appellee under its contract with appellee and his associates; and expressly releases and conveys unto appellee all of her rights under the contract.

Her acts have thus led both the Yount-Lee Oil Company and Farrell to alter their positions to their hurt and injury. Yount-Lee Oil Company has made payments to Farrell which it would not have made had appellant and her husband declined to execute the ratification instruments, and Farrell, relying upon her acts and deed, has used the proceeds, thus obtained as belonging exclusively to him. But appellant here sued Yount-Lee Oil Company and Farrell jointly for an undivided one-half interest in and to the payments made and to be made.

Under the undisputed facts and admissions found in this record, no court of equity would be justified in requiring either Yount-Lee Oil Company or Farrell to account for any sum paid to Farrell.

This is not simply a suit between appellant and appellee Farrell; it was brought by appellant to recover a large sum of money from an innocent third party—Yount-Lee Oil Company—and to cancel and destroy solemn instruments in writing, executed by appellant, for the benefit of Yount-Lee Oil Company, and upon which it relied in making the payments it has made to Farrell.

Appellant put Farrell upon the witness stand and by diligent inquiry brought out the fact that, within a day or two after appellant filed her suit for a divorce, her attorney, Zweifel, came to Farrell's office in search of information concerning the community estate, at which time Farrell gave Zweifel a copy of the Yount-Lee Oil Company contract, and a statement, dated May 31, 1931, showing a complete audit of Farrell's books and accounts, disclosing all of the community assets and all of the then known debts and liabilities, and which placed a valuation upon all of the assets. The delivery of such documents by Farrell to Zweifel was corroborated by the witness Corzelius, who was present. It is undisputed that Zweifel had these documents at least twenty-seven or twenty-eight days before the divorce suit was brought up by appellant. It is interesting to note that these facts, brought out by appellant, from the lips of Farrell, were never denied by any witness,

and no effort was made by appellant to lay a predicate to impeach either Farrell or Corzelius, but appellant carefully developed the fact that these documents were delivered to Zweifel after appellant left Fort Worth, and she contents herself with saying she did not see them.

Zweifel, the attorney whose services she accepted, could have denied receiving these documents, and an issue of fact would have then been raised, but he was not placed on the witness stand by appellant, although she testified that he dealt fairly with her, concealed nothing from her, and did not deceive her. In truth, the record discloses that he was fair with her; that he concealed nothing from her; and that he was diligent in protecting her rights and in securing for her the settlement that satisfied her and the judgment she desired.

The original petition, sworn to by appellant, filed in this cause, and introduced in evidence by her, sets up, in detail, the date and data covering the Yount-Lee Oil Company contract and the payments made and to be made to Farrell in cash and out of oil.

Appellant testified that she had no such information until June, 1933, when she received a letter written from Fort Worth, Tex., by Ligon & Co., dated June 7, 1933, telling her what her income (and Farrell's) was for the year 1931, up to July 31st of such year. This letter says she received on June 8th at her home in New Orleans, that she immediately called Zweifel on the 'phone; that he came to New Orleans at once and brought with him, already prepared, the original petition, which she filed in this cause. She verified it on June 10, 1933, and returned it to Zweifel with the letter received from Ligon & Co. and the income tax data which Ligon & Co. had sent to her. When she says that she and her attorney came into possession of the facts concerning the Yount-Lee Oil Company contract, and the facts concerning her income and Farrell's, for the period covering January 1, 1931, and July 31, 1931, inclusive, after the receipt of the Ligon & Co. letter, dated June 7, 1933, that does not raise an issue of fact as to whether or not she then, for the first time, learned and knew of these matters, when she testifies, in open court, that her attorney brought her original petition already prepared for her signature, from Fort Worth to New Orleans, immediately after she

telephoned him on June 8, 1931, and when the pleading, verified by her and introduced in evidence by her, sets out the nature, extent, and full consideration flowing to the community estate under the Yount-Lee contract; and when she expressly admitted that she knew at all times after the sale to Yount-Lee that the purchase price was $3,000,000, and that she and Farrell owned one-half of the purchase price.

She testified to marked familiarity with all of the business deals made by Farrell during the existence of the marriage relations. It is undisputed that practically all the community property owned, at the time of the separation, came from the sale of West Texas lands for the sum of $60,000, and from the sale of the East Texas lands to Yount-Lee Oil Company. She frankly admits that she was visiting her parents, in Florida, when the West Texas lands were sold by Farrell, and that he immediately communicated the facts to her; she likewise frankly admits that she was in California when the Yount-Lee sale was made, and that Farrell advised her of the facts concerning this sale.

She not only failed utterly to develop any fact or circumstance tending to show any concealment by Farrell of any fact relating to the existence, extent, or value of the community estate, she utterly failed to show that she was not at all times familiar with the facts, but, on the other hand, she shows that both she and her attorney were at all times familiar with these facts, and had ample information and time within which to learn the minute details between the time she filed her suit for a dissolution of the marriage contract and a division of the community estate, and the granting of the divorce.

Thus, it conclusively appears, from the undisputed evidence, the greater portion of which appellant produced, and none of which she attempted to controvert, or explain away, that she and her attorney knew, and must be held to have known, all of the facts concerning the existence, extent, and value of the community estate both before and when she executed the instruments, expressly ratifying her contract of settlement and the judgment she obtained, under and by virtue of which she caused both the Yount-Lee Oil Company and Farrell to materially change their positions with re-

spect to such properties. If her want of knowledge, as asserted in her pleadings, has any element of truth in it, she and her attorney have been guilty of laches and she cannot now complain.

The writer is of the opinion that the testimony introduced by appellant raises no issue of fraud practiced upon her by Farrell. He was and is a mere layman, neither having nor claiming to have any knowledge of the law, and if he made the statements which she credits him with making, concerning the lawsuits and debts existing at the time she contracted to settle her property rights for a definite monthly income, instead of a division in kind, such statements were mere opinions as to future developments and concerned matters that must be decided at some future time, wholly dependent upon conditions and contingencies which might, or might not, be established in the courts wherein the suits were pending. She will not be heard to say that she relied upon such opinions.

But, if these statements are to be considered more than mere opinions of a layman, they were made in the presence of her attorney, who dealt fairly with and diligently for her, and he was placed in possession of ample data and facts, which followed up and investigated by him would have given him and appellant all of the knowledge and facts that Farrell possessed at the time.

It is interesting to note that under the Yount-Lee contract it was obligated to pay Farrell on the basis of not less than 30 cents per barrel for the oil run, and the undisputed evidence discloses that when appellant made her settlement contract, a condition of almost chaos existed in the East Texas oil field; the best price being paid for oil was 15 cents per barrel, and the Yount-Lee had shut down its wells. The $1,000,000 oil payment was in a precarious position, because of these conditions. Farrell had been paid all of the cash consideration due him from the Yount-Lee, excepting the sum of $56,250, which would fall due September 1, 1931. Appellant testified that she knew the oil business was an uncertain and hazardous business. She nowhere denied that she knew of this chaotic condition affecting the community estate. Under these conditions, she wisely asked for and took a certain income of $750 per month to be paid to her so long as she lived, instead of taking her chances in the business.

The community's interest in the cash consideration, without deducting the expenses and settlements of suits and claims, of some of which she testifies she had knowledge, amounted to $635,000, and one-half of this gross sum amounts to $317,500, whereas she obtained, of her own volition, a contract from Farrell whereby he has bound himself to pay her $750 per month, so long as she lives, and her life expectancy was at that time at least forty years. If she lives, Farrell and his estate are obligated to pay her not less than $360,000. Her settlement was just, equitable, and fair.

Furthermore, she admits by her petition for a divorce, and by her original petition in this cause (both introduced in evidence by her), that she had not lived with Farrell, as his wife, since March 1, 1931, four months and seven days before she finally left him. She admits that they had gone for weeks, before the final separation, without speaking; she never once testified that she ever loved Farrell, but testified that she thought she did when she married him; she testified that life with him became unbearable, and that she was determined to divorce him. She thus makes out a case not of a trusting, overreached, and abused wife, but one who was dealing at arm's length with her husband. Instead of producing evidence tending to show that her husband was penurious with her and secretive as to his business matters, she shows by her own testimony that Farrell gave her everything she ever asked for and spent many thousands of dollars upon her—much of it needlessly—to satisfy her and to hold her as his wife; that he begged her to stay with him and to come back to him, even after she had divorced him, but that she repulsed him, excepting on the last meeting in August, 1931, when she had hurried to Fort Worth to prevent Farrell from obtaining a new trial in the divorce proceeding, at which meeting she promised him to come back to him at the end of six months and tell him everything, and if he still wanted her, she would remarry him. She exacted of him a promise not to communicate with her for six months, not to see her, and not to annoy her. At that time she was secretly married to her present husband, and she did not want him to know the truth about what she had done, or would do in the future. She says she had no intention, at that time, of ever living with Farrell again as his wife.

By this deceit she induced Farrell not to press his motion for a new trial in the divorce suit and made it impossible for him to set aside the very judgment which she here asks a court of equity to set aside. It is interesting to note that, while appellant gave no explanation of why she exacted of Farrell the promise to do nothing for six months, nevertheless Farrell's right to appeal, even by writ of error, from the judgment she obtained against him, would be barred in six months. The record does not suggest, nor can we conceive of any other reason that would move her to set such a time limit upon the activities of Farrell. Her undisputed testimony shows that she came to Fort Worth at that time for the sole purpose of preventing Farrell from obtaining a new trial in the divorce suit, and that she practiced the deceit detailed for such express purposes.

She cannot, in the face of such inequitable conduct on her part, now come to a court of equity and ask that a part of the judgment which she sought and obtained— which she claims is distasteful to her—be set aside, when she thus prevented Farrell from setting aside the whole judgment, which was distasteful to him. Let him who comes into a court of equity come with clean hands.

Appellant introduced no evidence tending to support the following allegations: That the $1,000,000 oil payment would finally yield only a small revenue; that practically all of the cash realized from the Yount-Lee sale had been applied and would have to be applied on the community debts; that the sum of $500 per month would be a fair, equal, and adequate compensation to her for her one-half interest in the community estate; that Farrell was secretive with respect to his business affairs, and concealed the facts concerning their properties from her; that she made diligent effort to discover the true facts concerning the extent and value of the community estate, but all of her efforts were met with a studied attempt on Farrell's part to conceal the truth and prevent her from knowing the true facts; that Farrell brought about the separation and "kicked her out"; that Farrell worshiped the almighty dollar, and was penurious in his dealings with her; that Farrell forced the divorce action on her. Having pleaded that Farrell was "reticent and seclusive" with respect to his deals and the community properties, and that her diligent efforts to learn the true facts concerning the same were met by a studied attempt on Farrell's part to conceal the truth from her, and that because of such acts on his part she does not now know the facts, she shows that she did not rely upon his statements with regard to the extent and value of the community estate, and it was incumbent upon her to produce testimony tending to prove these allegations. This she wholly failed to do.

Appellant credits Farrell with saying to her: "I could take what he would give me, or I could take nothing." This was not a representation of a fact, but was such a statement as was calculated to put appellant on her guard. The statement, if made, establishes the fact that the parties were then dealing at arm's length, and that an atmosphere of hostility pervaded the home, where the conference was being held.

But if it be viewed as the statement of a fact, appellant cannot be heard to say she relied upon it, because she frankly admits that Zweifel advised her with regard to her community rights—that she was entitled to one-half of the community estate and, in addition thereto, to the use of the homestead. In fact, she testified that she knew what her rights were, before Zweifel advised her.

As to the issue, raised in her pleadings, of a mental condition, rendering her incapable of sound judgment, caused by grieving over the accidental death of her little son, on February 19, 1931, she introduced no evidence sufficient to raise such an issue.

On the other hand, she testifies that within about three days after she filed her suit for a divorce, she met her present husband; that they became interested in one another; that this friendship ripened into love and she became engaged to marry him in less than three weeks and before the date on which she called up her divorce suit for trial. She developed by her testimony the fact that she was mentally alert on the 7th and 8th of July, 1931.

All of these acts and deeds on the part of appellant are those of a young woman normal in mind and body, and not of one who was so bowed with grief that she was incapable of understanding the consequences of her acts. She married the man to whom she was then engaged; she fought to prevent Farrell from setting

aside the divorce decree and thus destroying her new marital relations, and she is at this time living with her new husband.

Appellant declined to testify that she wanted the community estate divided, when she obtained her decree—she goes no further than to testify that she could not say she would not have taken one-half of the community estate, if it had been given to her. She specifically testified that she would not say she wanted the estate divided, when she obtained her decree.

The district judge, before whom she urged her divorce suit—Justice Lattimore —detailed the facts covering what was said and done at her trial. He testified positively that when he looked over the settlement agreement, he told appellant she was making a mistake in not taking her portion of the community estate—that every month, when she received her check, the old wounds would be reopened—that she would be better satisfied if she took her community interest. Justice Lattimore testified that she refused to take his advice, but told him that she wanted the matter settled as had been agreed upon—that he then approved the settlement agreement. She did not deny these facts.

The record nowhere discloses that appellant testified that she relied upon the statements, with which she credits Farrell, or that she was induced to make the contract, secure the judgment, and execute the ratifying instruments, by reason of such statements.

She utterly failed to meet the burden that was upon her and, without such testimony, no issue of fraud was raised.

Sifted to the bottom, appellant's case rests solely upon the proposition that, if she did not in fact actually obtain the equivalent of one-half of the community estate, she is, as a matter of law, entitled to set aside a solemn judgment that she sought and obtained, and to cancel the contract she made, and all instruments, executed by her, ratifying the judgment and her contract of settlement.

This is not the law. Such a proposition is destructive of every principle which recognizes the sanctity of judgments of courts of competent jurisdiction. Harn v. Phelps, 65 Tex. 592, 597, cited in the case of Wagley v. Wagley (Tex. Civ. App.) 230 S. W. 493.

The writer attaches no importance to the loose statements and dicta found in some of the opinions of Courts of Civil Appeals upon which appellant relies.

It will be noted that these utterances have never been approved by, nor have any like utterances been made by, the Supreme Court, or the Commission of Appeals; but in every case, where a judgment has been attacked by a direct proceeding, the established rules were required to be met.

Appellant failed to bring herself within the bounds of a court of equity, and the peremptory instruction was properly given by the trial court.

LATTIMORE, Justice (concurring).

The facts of this case have been so ably analyzed by my associates that I shall content myself with a consideration of the authorities, a discussion of which presupposes that the reader is familiar with the contents of their opinions.

In general, the decisions upon divisions of community property by court upon divorce may be divided into those cases in which the spouses leave to the court the division of the community, and those cases in which is involved an agreement existent at the time of the divorce.

In the first class are Aucutt v. Aucutt (Tex. Civ. App.) 63 S.W.(2d) 755, in which the agreement had been set aside already; Reasonover v. Reasonover (Tex. Civ. App.) 59 S.W.(2d) 887, Phillips v. Phillips (Tex. Civ. App.) 203 S. W. 77, Cunningham v. Cunningham, 120 Tex. 491, 40 S.W.(2d) 46, 75 A. L. R. 1305, which dealt only with future support of the children; Cox v. Mailander (Tex. Civ. App.) 178 S. W. 1012, in which some of the various agreements had been terminated by resumption of the marriage relation; Murray v. Murray, 67 Tex. 665, 4 S. W. 357, in which the opinion reversed the sustaining of a general demurrer to a wife's complaint that while she was out of the state and unable to return and defend herself, her husband had procured a decree based on his perjured testimony that all the property was his separate property—see Warne v. Jackson (Tex. Civ. App.) 273 S. W. 315, 317, so analyzing the opinion.

In some of those opinions by the language used it is said that the court cannot, in a divorce case, divest a spouse of title to community property, but the phrases cannot be lifted from their context and made into an inflexible rule. In truth,

the statements are founded on article 4638, R. S., that "nothing herein shall be construed to compel either party to divest himself or herself of the title to real estate." Our case is not one of compulsion but rather a decree of court pursuant to an agreement and rendered after the insistence of appellant upon it.

The second class are in turn to be divided into those separation agreements not confirmed by judgment, and those which are so confirmed. It is apparent that there is a practical difference, because the first are beyond the power of the complainant to alter them after signing save by suit, while the latter class continue subject to the right of the wife to disaffirm upon any substantial ground by pleading those grounds to the trial judge upon the trial. Moreover, upon public policy some stability must attach to a final judgment and litigants must be required to use due diligence to present their cases at the time appointed. "To hold otherwise * * * would have the effect of opening a way for capricious attacks upon all judgments rendered in suits adjudicating the property rights of divorcees, would jeopardize the integrity of all such judgments, and unsettle property rights now securely at rest under the solemn sanction of the courts of the state." Snow v. Cook (Tex. Civ. App.) 278 S. W. 520, 521; Warne v. Jackson, supra. In either class the same proof is sufficient as to the making of the contract, but in the latter the additional burden exists for plaintiff's failure to exercise the diligence the courts must demand in the interest of public security.

In the first division of this second class are Cox v. Mailander (Tex. Civ. App.) 178 S. W. 1012; Link v. Link (Tex. Civ. App.) 63 S.W.(2d) 1045; Moor v. Moor (Tex. Civ. App.) 255 S. W. 231; Rains v. Wheeler, 76 Tex. 390, 395, 13 S. W. 324; Kuehn v. Kuehn (Tex. Civ. App.) 232 S. W. 918; Id. (Tex. Com. App.) 242 S. W. 719. In each of those cases, as well as those we shall presently list under the second subdivision, there existed (1) a definite affirmative misstatement of what the community estate then owned; (2) ignorance of the plaintiff of the truth and a practical inability of the wife to discover the truth; (3) a belief in and reliance upon the misrepresentations; (4) innocence of the complainant of any misrepresentations in procuring the defendant to accept the divorce decree. The opinions of my associates show clearly that no one of these four elemental conditions exist here. The citation of Kuehn v. Kuehn (Tex. Civ. App.) 232 S. W. 918, 926, is hardly appropriate, for while that opinion states that a prima facie case is pleaded when the petition alleges that complainant did not get one-half the community property, that statement is directly contrary to Hedtke v. Hedtke, 112 Tex. 404, 248 S. W. 21, and, moreover, the Kuehn Case went on to the Supreme Court on a granted writ of error and the opinion of the Commission of Appeals, 242 S. W. 719, is wholly silent of approval of such doctrine, but holds there was an issue of fact as to fraud; that fraud was perpetrated both during the pendency of the divorce suit and was continued into some time thereafter to carry the agreement to conclusion. In the Farrell Case the situation is reversed: This appellant, then Mrs. Burguieres but posing as yet Mrs. Farrell, perpetrates a fraud on Farrell to carry the agreement to conclusion.

A separation agreement must be, as such, enforced by equity. It was unknown to the common law. Hence, he who offers it must sustain it by rules of equity. But when it becomes a judgment, it is more than a contract in equity, and he who would abrogate that judgment must fulfill the same rules of equity.

Moreover, this Farrell Case is classified in the second division of the second class, as I have here attempted to divide them, i. e., those cases where the contract of settlement is carried forward into judgment and is the decree of the court, dividing the community estate as it "deems just and right, having due regard to the rights of the parties." The precedents therefor are Celli v. Sanderson (Tex. Civ. App.) 207 S. W. 179; Eldridge v. Eldridge (Tex. Civ. App.) 259 S. W. 209; Ralls v. Ralls (Tex. Civ. App.) 256 S. W. 688; Swearingen v. Swearingen (Tex. Civ. App.) 193 S. W. 442, all cited by appellant; and Donnelly v. Donnelly (Tex. Civ. App.) 289 S. W. 110; Grant v. Grant (Tex. Civ. App.) 286 S. W. 647; Snow v. Cook (Tex. Civ. App.) 278 S. W. 520, and Sperry v. Sperry (Tex. Civ. App.) 103 S. W. 419. In the beginning, let me say that by those very precedents it is not unlawful for the court to approve a settlement

by which one spouse receives her interest all in money and the other all in real estate. Celli v. Sanderson, supra.

Neither is it true that each spouse must necessarily receive one-half the community. Hedtke v. Hedtke, 112 Tex. 404, 248 S. W. 21; Rice v. Rice, 21 Tex. 58; Hughes v. Hughes (Tex. Civ. App.) 259 S. W. 180.

In Celli v. Sanderson, supra, the appellant represented that the estate was then insolvent and concealed from the wife the existence of any property except the lots she was getting and this continued during the pendency of the divorce suit when same "was about the only issue," although no issue was made of her knowledge or lack of diligence, and the opinion is, consequently, not more specific.

The court says in Eldridge v. Eldridge (Tex. Civ. App.) 259 S. W. 209, 215: "The estate was of a complicated nature and appellant could not ascertain the true condition thereof, that she nor her attorneys could learn the true financial condition of the community estate."

The case was before the appellate court on the pleadings. Here Mrs. Farrell has testified and admits she knew of the Yount-Lee contract which was the bulk of the estate and her attorney, whom she still defends, knew all. Eldridge furnished a false inventory to deceive his wife—Farrell furnished a true auditor's report to his wife's lawyer. Mrs. Eldridge relied on the statements of her husband. Mrs. Burguieres did not so testify. "The court of chancery extends its relief only to the worthy and those whose conduct has not deprived them of the right to enter a tribunal dedicated to honor and uprightness". Justice Fly applied that rule to the Eldridge Case and we have done the same in the Farrell Case.

In Ralls v. Ralls (Tex. Civ. App.) 256 S. W. 688, 695, the husband solicited two lawyers to file suit for his wife, but rejected them when they informed him he must treat her fairly, and the record proves her correct in so saying. Justice Boyce there said: "The whole matter was so managed by her husband [Ralls] as to prevent her from ascertaining the extent of her rights." Farrell furnished an audit of his estate. Justice Boyce says: "The agreement itself contemplated a mock trial. * * * The fraud was upon the court as well as the wife." Mrs. Farrell insisted to the court on divorce that the division was as she wanted it.

In Swearingen v. Swearingen (Tex. Civ. App.) 193 S. W. 442, the husband told his wife that all the community estate consisted of $1,200 and that he would provide for her future support with their children. In fact, the estate consisted of $17,000 and the husband had hidden a large part of that in Mexico pursuant to a scheme to get rid of his wife without giving her her share thereof. Such a case is wholly different from the one at bar, as is shown in the facts reiterated in all our opinions.

In each of the last-cited cases, the record was clear of any suggestion that the complainant, in review, was not justified in proceeding to judgment in the divorce. This record affirmatively shows that Mrs. Farrell either knew of what she now complains or had the facts presented to her in such compelling fashion as that only deliberate blindness or gross negligence can excuse her lack of knowledge. Proetzel v. Schroeder, 83 Tex. 684, 19 S. W. 292. These principles are illustrated in Donnelly v. Donnelly (Tex. Civ. App.) 289 S. W. 110, where it is held that plaintiff's knowledge or that of her attorney prevented her prevailing in a bill of review, and Sperry v. Sperry (Tex. Civ. App.) 103 S. W. 419.

I am of the view that our decision is not in conflict with any final decision of our appellate courts of Texas, but is in accord with and supported by the principles of law underlying all of them. Facts differ and call for different decisions on the same rules of court. It is so here.

## On Motion for Rehearing.

DUNKLIN, Chief Justice.

Appellant calls attention to certain allegations of fraudulent representations made by the defendant Farrell which induced her to enter into the settlement agreement and which it is insisted were additional to those stated in the opinion of this writer as the only representations relied on by her, and that therefore the statement in the opinion is contrary to the record. The alleged misrepresentation referred to in the opinion was taken from appellant's brief, in which it was alleged that the same was the one which induced the plaintiff to execute the agreement and it embodied the gravamen and substance of all

of appellant's testimony on that issue. Other specific allegations of misrepresentation appearing in the petition were merely amplifications of the main complaint and were not supported by any specific testimony of plaintiff and, as shown in the testimony of plaintiff herself, cited in the motion, one of those the defendant did not make.

It is insisted further that the evidence did not conclusively show that the defendant John E. Farrell filed a motion for new trial in the divorce case on the last day allowed for filing, and that whether or not the same was so filed was a controverted issue of fact, and in that connection this is said in the motion for rehearing: "That the fact issue, as to whether the motion for new trial was filed, should have been submitted to the jury, is beyond doubt, and when it is once conceded that this said issue should have been submitted to the jury and that the filing of said motion for new trial cannot be conceded and assumed as a matter of fact, the entire opinion of this Honorable Court rendered herein must fall."

The motion for new trial was introduced in evidence and had this indorsement thereon: "Filed August 18, 1931, D. T. S." D. T. Swint, who was deputy clerk of the court, testified that those initials were in his handwriting. That indorsement on the motion showed a filing of the instrument within the meaning of the statute, and its legal effect as such could not be destroyed by further testimony of the deputy clerk that no notation of such filing was entered upon the file docket, fee docket, or any other docket kept in his office, and that he did not keep the motion among the papers in his office after the filing and had no independent recollection of such filing. Especially so, in the absence of any showing that either Mrs. Farrell or her attorney refrained from taking any steps with respect to the judgment in reliance upon the belief that such motion had not been filed. Furthermore, in appellant's motion filed in this court, and heretofore disposed of, to disqualify Hon. Hal S. Lattimore on the ground that he, as district judge who tried the divorce case, had, after the rendition of the judgment in that case, dictated for defendant J. E. Farrell a motion for new trial which was then filed, it was alleged as follows:

"* * * Which said motion as filed in the District Clerk's office within the ten days provided by law, was in terms as follows" (here follows a verbatim copy of the motion for new trial now in controversy).

If the right of the defendant to file an amended motion for new trial or prosecute an appeal within the time provided by law had hinged upon whether or not the original motion had been filed, as evidenced by the indorsement thereon, we believe it clear the decision would have been in his favor, under the following authorities: 36 Tex. Jur. par. 12, p. 409, par. 13, p. 411, and numerous decisions there cited; Brogdon v. State, 63 Tex. Cr. R. 475, 476, 140 S. W. 352; 2 Words and Phrases, Second Series, pages 531, 533, and authorities there cited.

If it be true, as testified by plaintiff, that when she returned from New Orleans and met the defendant in Fort Worth after learning that a motion for new trial had been filed in the divorce case, he then told her no such motion had been filed, yet her further testimony showed that notwithstanding the same, she endeavored to dissuade him from prosecuting the motion and promised that if he would withdraw it and leave her alone for six months, she would return to Fort Worth and remarry him, and telling him at the same time she had not then married another man. Notwithstanding that offer could not have been complied with since she then had already married Albert Burguieres, her present husband, without the knowledge of defendant, nevertheless her said offer showed conclusively, as a matter of law, an intention and election to claim the benefits decreed to her by the judgment rendered in accordance with the property settlement agreement.

Certain portions of the plaintiff's testimony are cited in an effort to show that she was not fully informed of several ventures in the oil business by the defendant antedating the Yount-Lee oil contract in controversy. The statement in the opinion that she was thoroughly familiar with those properties was based upon her testimony showing at least a general knowledge, and in some instances intimate information concerning all those transactions. However, if it could be said that certain excerpts from her testimony would be sufficient to make that a controverted

issue, still the same could not have been submitted to the jury as a special issue, since plaintiff's suit was based upon her testimony relating· to the Yount-Lee oil contract and proceeds realized therefrom, and not upon any misrepresentations pertaining to the outcome of those prior ventures, which, according to her own testimony, proved failures and left defendant in a bankrupt condition three times.

Complaints of other errors in the original opinion of this writer, heretofore filed, have been carefully considered and the conclusion reached that for the reasons stated they are without .merit.

The motion for rehearing and in the alternative to certify on the ground of conflict with other decisions cited is overruled.

LATTIMORE and BROWN, JJ., concurring.